Max Doyle **PERKINS**, Petitioner,

v.

**STATE OF NORTH CAROLINA**,
Respondent.

Civ. No. 2234.

United States District Court
W. D. North Carolina,
Asheville Division.

Heard Aug. 21, 1964.

Decided Oct. 5, 1964.

William Haywood Bobbitt, Jr., Charlotte, N. C., and James P. Erwin, Jr., Asheville, N. C., for petitioner.

Theodore C. Brown, Jr., Staff Atty., Office of Atty. Gen. of North Carolina, Raleigh, N. C., for respondent.

CRAVEN, Chief Judge.

On January 8, 1962, Max Doyle Perkins and Robert Eugene McCorkle were jointly indicted by the grand jury of Mecklenburg County, North Carolina. It was charged that they "did unlawfully, willfully, maliciously and feloniously commit the abominable and detestable crime against nature with each other." McCorkle pleaded nolo contendere, received a sentence of five to seven years, served a portion of it, and has been released. Perkins, after conviction by a jury upon his plea of not guilty, was sentenced to a term of not less than twenty nor more than thirty years. The disparate sentences were passed by the same judge.

## JURISDICTION

Perkins asked the Superior Court of North Carolina to review the constitutionality of his trial pursuant to the Post-Conviction Hearing Act of North Carolina.[1] His petition was denied. Although there is some question as to whether or not he presented the same alleged constitutional defects to the superior court that are now presented to this court, there was enough in his petition to afford the state court the opportunity to pass upon the matters of which he now complains. Since he apparently was not afforded counsel in the state post-conviction proceeding, despite the plain provision of the North Carolina

1. N.C.G.S. Sections 15-217 to 15-222.

statute for the appointment of counsel,[2] any doubt as to the technical sufficiency of his petition should be resolved in his favor. There has been sufficient exhaustion of state remedies to make it appropriate for a federal court to entertain Perkins' petition for writ of habeas corpus.[3]

## VALIDITY OF THE STATUTE— VAGUENESS

Perkins was convicted of a violation of N.C.G.S. § 14–177, which reads in its entirety as follows:

"If any person shall commit the abominable and detestable crime against nature, with mankind or beast, he shall be imprisoned in the State's prison not less than five nor more than sixty years."

The statute is copied from the first English statute on the subject passed in the year 1533 during the reign of King Henry VIII. It was adopted in North Carolina in 1837 with only one difference. The words "vice of buggery" which appeared in the ancient English statute were omitted and instead there was substituted the delightful euphemism "crime against nature, not to be named among Christians." It then read in its entirety:

"Any person who shall commit the abominable and detestable crime against nature, not to be named among Christians, with either mankind or beast, shall be adjudged

guilty of a felony, and shall suffer death without the benefit of clergy."

By 1854 Christians had become more articulate and less clergical. The phrases "not to be named among Christians" and "without benefit of clergy" were deleted from the statute. Finally, in 1869, the death penalty was limited to murder and the like. The punishment for crime against nature was limited to sixty years maximum. Since 1869 the statute has remained unchanged—in itself a shocking example of the unfortunate gulf between criminal law, and medicine and psychiatry.

The evidence against Perkins tended to show that his criminal conduct consisted of *fellatio*.[4]

What is "the crime against nature"? The statutory history shows that beyond question it was "buggery" at common law. According to the great weight of authority, as well as the far better reasoned cases, the conduct of Perkins (*per os*) was *not* buggery at common law.[5] Yet, in State v. Fenner, 166 N.C. 247, 80 S.E. 970, (1914), the North Carolina Supreme Court misinterpreted both the statute and the common law in holding that the statute covered sexual acts *per os*;[6] and as recently as 1961 the court has affirmed Fenner and said that since the Legislature has failed to act to amend the statute the court's interpretation must be indicative of the legislative intent.[7]

---

2. "If the petitioner is without counsel and alleges in the petition that he is without means of any nature sufficient to procure counsel, he shall state whether or not he wishes counsel to be appointed to represent him. If * * * so requested, the court *shall* appoint counsel if satisfied that the petitioner has no means sufficient to procure counsel." N.C.G.S. § 15–219.

3. 28 U.S.C.A. § 2254; Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

4. Sexual stimulation *per os*.

5. People v. Schmitt, 275 Mich. 575, 267 N.W. 741 (1936); Koontz v. People, 82

Colo. 589, 263 P. 19 (1927); Wise v. Commonwealth, 135 Va. 757, 115 S.E. 508 (1923); Glover v. State, 179 Ind. 459, 101 N.E. 629, 45 L.R.A.,N.S., 473 (1913); State v. Start, 65 Or. 178, 132 P. 512 (1913); Commonwealth v. Poindexter, 133 Ky. 720, 118 S.W. 943 (1909); People v. Boyle, 116 Cal. 658, 48 P. 800 (1897); 81 C.J.S. Sodomy § 1b(3).

6. How the error occurred is documented in James R. Spence, The Law of Crime Against Nature, 32 N.C.Law Rev. 312–316.

7. State v. Whittemore, 255 N.C. 583, 122 S.E.2d 396 (1961).

■ If the statute were a new one, it would be obviously unconstitutional for vagueness. The former concern for the feelings of those reading the statute has yielded to the necessity that an indicted person know of what he is charged. Euphemisms have no place in criminal statutes. But this is not a new statute, and it has been interpreted many times by the North Carolina Supreme Court.[8] Although the court has said it means much more than it meant at common law or as an enactment during the reign of Henry VIII, its decisions have made equally clear that crime against nature does not embrace walking on the grass.

In Erie Railroad v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), it was said:

"Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern."

In Musser v. Utah, 333 U.S. 95, 98, 68 S.Ct. 397, 398, 92 L.Ed. 562 (1948), the Court said:

"What the statutes of a state mean * * * are questions on which the highest court of the state has the final word. The right to speak this word is one which * * * we should scrupulously observe."

■ The obviously vague statute must be read as if it incorporates the judicial interpretations placed upon it by the Supreme Court of North Carolina,[9] and with those interpretations added, it is not unconstitutionally vague. Furthermore, this court is bound by the interpretations of the North Carolina Supreme Court including the one that conduct such as Perkins' (per os) was within the prohibition of the statute.

## CRUEL AND UNUSUAL PUNISHMENT

■ The prohibition of cruel and unusual punishment contained in the Eighth Amendment of the United States Constitution applies to the states through the due process clause of the Fourteenth Amendment.[10]

In Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1957), the Court said "[t]he exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court. * * * The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." And in Weems v. U. S., 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), the Court said that the inhibition was directed "against all punishments which, by their excessive length or severity, are greatly disproportioned to the offenses charged."

Imprisoning Perkins for his homosexual conduct is not unlike putting a

8. State v. Walston, 259 N.C. 385, 130 S.E.2d 636 (1963); State v. King, 256 N.C. 236, 123 S.E.2d 486 (1962); State v. Jernigan, 255 N.C. 732, 122 S.E.2d 711 (1961); State v. Whittemore, 255 N.C. 583, 122 S.E.2d 396 (1961); State v. Ownbey, 247 N.C. 271, 100 S.E.2d 505 (1957); State v. Pegelow, 247 N.C. 270, 100 S.E.2d 499 (1957); State v. Williams, 247 N.C. 272, 100 S.E.2d 500 (1957); State v. Lance, 244 N.C. 455, 94 S.E.2d 335 (1956); State v. Mintz, 242 N.C. 761, 89 S.E.2d 463 (1955); State v. Spivey, 213 N.C. 45, 195 S.E. 1 (1938); State v. Callett, 211 N.C. 563, 191 S.E. 27 (1937); State v. May, 211 N.C. 740, 190 S.E. 343 (1937); State v. Griffin, 175 N.C. 767, 94 S.E. 678 (1917);

State v. Fenner, 166 N.C. 247, 80 S.E. 970 (1914).

9. Bandini Petroleum Co. v. Superior Court, 284 U.S. 8, 18, 52 S.Ct. 103, 76 L.Ed. 136 (1931); Winters v. New York, 333 U.S. 507, 510, 68 S.Ct. 665, 92 L.Ed. 840 (1948).

10. Gideon v. Wainwright, 372 U.S. 335 at 341, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Robinson v. California, 370 U.S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); Lambert v. California, 355 U.S. 225, 231, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957); State of Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463, 67 S.Ct. 374, 91 L.Ed. 422 (1946).

person in jail for being addicted to the use of narcotics, as was done in Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). In that case the United States Supreme Court held that the statute inflicted a cruel and unusual punishment, but it is important to note that the statute had been interpreted to condemn the *status* of narcotic addiction as a criminal offense. Perkins was convicted of an overt *act*—a distinction more important to law than medicine and one which conveniently ignores causative factors of homosexuality—but nevertheless a legally valid distinction.

 Does the mere duration of sentence—twenty to thirty years—make it "cruel and unusual" within the prohibition of the Constitution? The Attornel General of North Carolina, although requested to do so, has not called to the court's attention any sentence under this statute in excess of five years where the offenders were both adult males.[11] It may be judicially noticed, certainly within the last decade, that sentences imposed on adult homosexual offenders in the North Carolina courts, absent special circumstances, seldom if ever exceeded the five year statutory minimum. The moderation of North Carolina judges in this respect is probably the reason why the Legislature has not long since felt required to amend the statute. If the usual five year sentence is "right", then twenty to thirty years is "wrong". Certainly twenty to thirty years is unusual. There can be no justification for such disparity of punishment.[12] But the sentence is within the astounding statutory limit of "not less than five nor more than *sixty* years", and it is well settled that within statutory limits even the harshest sentence, absent exceptional circumstances, is not cruel and unusual within the meaning of the Constitution.[13]

Is such an exceptional circumstance present here? The co-defendant in the same indictment who pleaded nolo contendere was sentenced to five to seven years; whereas Perkins who pleaded not guilty and subjected the court to affording him trial by jury was sentenced to twenty to thirty years. It is easy to suspect that Perkins may have been punished for insisting upon his right to trial by jury. Indeed, court-appointed counsel concedes that Perkins *may* have been punished in part for pleading not guilty. But the inference is of doubtful validity. Perkins and his co-defendant, McCorkle, were apparently quite different in background and in previous homosexual conduct. Although the difference is not enough to justify the extreme disparity of punishment, it is enough to cast doubt upon what otherwise might be inferred: that his not guilty plea inconvenienced the court and that he was punished for it.

It is only fair to say that many judges favor lighter sentences for those who plead guilty and heavier sentences for at least some of those who insist on a trial. No one who has ever sat a trial bench can deny that there is some frustration for the judge required to conduct a trial, the result of which, in his judgment, is a foregone conclusion. And it has been said that criminal dockets cannot be kept current unless there is "some reward which makes the plea of guilty attractive." [14] But compare United States v. Wiley, 278 F.2d 500 (7th Cir. 1960), where a sentence was reduced because of such sentencing philosophy.

---

11. Six weeks before the hearing the court requested that the state determine from the Director of Prisons what percentage of offenders, if any, were serving sentences in excess of five years. The Attorney General advised that no such records were kept.

12. In reporting favorably Public Law 85–752 (28 U.S.C.A. § 334) to provide for the convening of judicial institutes to study sentencing, the Senate Judiciary Committee commented that "The existence of wide disparities casts doubt upon the evenhandedness of justice and discourages a respect for the law." 30 F.R.D. 401, 413.

13. U. S. v. Martell, 335 F.2d 764 (4th Cir. 1964) and cases cited therein.

14. Seminar and Institute on Disparity of Sentences, 30 F.R.D. at 448, 449.

## RIGHT TO COUNSEL

"(I)t is a denial of the accused's constitutional right to a fair trial to force him to trial with such expedition as to deprive him of the effective aid and assistance of counsel."[15]

Indictment by the grand jury occurred on Monday, January 8, 1962. At about 4:00 P. M. on Tuesday afternoon, because of indigency, counsel was appointed for Perkins. At 9:00 A. M. on Wednesday morning the trial was begun, completed that day, and sentence and judgment imposed. Previous to the appointment of counsel, Perkins himself had asked the court for a continuance, and it had been denied. Perkins asked his court-appointed lawyer to attempt to get a postponement, and the lawyer talked with the Solicitor, but was unable to get his consent to it. Apparently, counsel decided that a formal motion to the court would be futile, and none was made.

Counsel advised Perkins to go see his witnesses (three in number) the night before the trial and have them in court the next morning. They were not interviewed by court-appointed counsel. They did not appear. Nor were they subpoenaed to appear.

Despite the foregoing factual situation, court-appointed counsel testified that he had sufficient time to prepare the case for trial. Since he neither interviewed defendant's proposed witnesses nor caused them to be subpoenaed, the inference is inescapable that counsel, after talking with state officers, became so convinced of Perkins' guilt that he considered making any defense an utter futility and therefore attempted none. His appraisal may have been entirely correct, but, as the Supreme Court of North Carolina said in State v. Farrell, 223 N.C. 321, 26 S.E.2d 322 (1943):

"Whether his defense before a jury after full preparation would have availed him is for the present purpose immaterial. The law provides one mode of trial and it is the same for the innocent and for the guilty. The fact that an accused person on the trial may be shown to be guilty is not, of itself, sufficient reason to deny him full opportunity to present, through counsel, such defense as he may have to the charge. People v. Lavendowski, 326 Ill. 173, 157 N.E. 193; People v. Kurant, 331 Ill. 470, 163 N.E. 411."

Again, in State v. Speller, 230 N.C. 345, 53 S.E.2d 294 (1949), Ervin, J., speaking for the North Carolina Supreme Court said:

"Both the State and Federal Constitutions secure to every man the right to be defended in all criminal prosecutions by counsel whom he selects and retains. N.C.Const. Art. I, sec. 11; U.S.Const. Amend. XIV. This right is not intended to be an empty formality. It would be a futile thing, indeed, to give a person accused of crime a day in court if he is denied a chance to prepare for it, or to guarantee him the right of representation by counsel if his counsel is afforded no opportunity to ascertain the facts or the law of the case. As the Supreme Court of Georgia declared in Blackman v. State, 76 Ga. 288: 'This constitutional privilege would amount to nothing if the counsel for the accused are not allowed sufficient time to prepare his defense; it would be a poor boon indeed. This would be "to keep the word of promise to our ear and break it to our hope" '. Since the law regards substance rather than form, the constitutional guaranty of the right of counsel contemplates not only that a person charged with crime shall have the

15. White v. Ragen, 324 U.S. 760, 764, 65 S.Ct. 978, 980, 89 L.Ed. 1348 at 1352 (1944). See also: Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527 (1932); Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L. Ed. 377 (1940); Ex parte Hawk, 321 U.S. 114–116, 64 S.Ct. 448, 88 L.Ed. 572–574 (1944); House v. Mayo, 324 U. S. 42, ante, 739, 65 S.Ct. 517, supra, 89 L.Ed. 739 (1945).

privilege of engaging counsel, but also that he and his counsel shall have a reasonable opportunity in the light of all attendant circumstances to investigate, prepare, and present his defense. State v. Gibson, 229 N. C. 497, 50 S.E.2d 520; State v. Farrell, 223 N.C. 321, 26 S.E.2d 322."

Paraphrasing what was said in Powell v. Alabama, 287 U.S. 45, at 58, 53 S. Ct. 55, it is not enough that counsel may have thought there was no defense and exercised his best judgment in proceeding to trial without preparation. Nor is it enough that counsel himself thought there was sufficient time for preparation when he made none. "Neither counsel nor the court could say what a thorough-going investigation might disclose as to the facts. No attempt was made to investigate. No opportunity to do so was given." [16]

In State v. Lane, 258 N.C. 349, 128 S. E.2d 389 (1962), the defendant was convicted of crime against nature with a sixteen year old boy. Counsel was appointed at 9:30 A.M. and the trial began at 2:30 P.M. *All* witnesses requested by the defendant were brought into court. It was held that the defendant was entitled to a reasonable opportunity in the light of all the attendant circumstances to investigate, prepare, and present his defense and that the allowance of only *five* hours for the preparation of the case resulted in a denial of defendant's right to counsel.

In the instant case, *none* of Perkins' witnesses were brought into court. Nor

did court-appointed counsel interview them or otherwise investigate to determine if there were a defense. In State v. Lane, supra, five daytime business hours elapsed between appointment of counsel and trial. In the instant case, (appointment at 4:00 P.M. on Tuesday and trial at 9:00 A.M. on Wednesday) not more than two daytime business hours were allowed.

 Plainly counsel was not afforded reasonable opportunity to investigate and prepare for trial. In the light of these attendant circumstances, there was "such expedition as to deprive" Perkins "of the effective aid and assistance of counsel." [17]

It will be ordered that the petitioner be released within sixty days unless the State elects to try him again.

In all probability Perkins will be tried again, found guilty, and resentenced.

Putting Perkins into the North Carolina prison system is a little like throwing Brer Rabbit into the briarpatch.[18] Most doctors who have studied homosexuality agree that prison environment, including close, continuous, and exclusive contact with other men, aggravates and strengthens homosexual tendencies and provides unexcelled opportunity for homosexual practices. For the confirmed homosexual, imprisonment can accomplish no rehabilitative function; instead, it provides an outlet for the gratification of sexually-deviate desires.[19]

There is some indication of a willingness to take a fresh look at the statutes

16. Powell v. Alabama, 287 U.S. 45 at 58, 53 S.Ct. 55, 60, 77 L.Ed. 158, 84 A.L.R. 527 (1932).

17. White v. Ragen, 324 U.S. 760, 65 S.Ct. 978, 89 L.Ed. 1348 (1944).

18. Uncle Remus enthusiasts will remember that Brer Rabbit begged Brer Fox to roast him, hang him, skin him, snatch out his eyeballs, tear his ears out by the roots, cut off his legs—do anything but throw him in the briarpatch. Fortunately for Brer Rabbit, Brer Fox chose what he thought was the maximum punishment. Uncle Remus, by Joel Chand-

ler Harris (New York and London, D. Appelton and Company, 1916, p. 18).

19. On the subject of homosexuality generally, see: An Evaluation of the Homosexual Offender by Dr. Bernard C. Glueck, Jr. of the Department of Psychiatry, University of Minnesota Medical School, 41 Minn.L.Rev. 187 (1957); Krich, The Homosexuals (1961); Mercer, They Walk in Shadow (1959); Masters, The Cradle of Erotica; Society of Medical Psychoanalysts, Homosexuality (1962); Donnelly, Goldstein, and Schwartz, Criminal Law 123–202 (1962); Wheeler, "Sex Offenses: A Sociological

such as that of Henry VIII, recodified as N.C.G.S. § 14-177, *supra*. The American Law Institute proposes to punish only those "deviate sexual relations" which involve force, imposition, or corruption of the young.[20] Voluntary, private homosexual acts between adults are specifically excluded. Although many states still impose strict, and often harsh punishment on homosexual offenders, a few, notably New York, have relegated such acts to the misdemeanor level, except those which involve force or the corruption of children.[21] The French penal code does not punish ordinary homosexual acts. In Germany the maximum punishment is ten years imprisonment, and there is no minimum term of imprisonment in the ordinary case between adults.[22]

Is it not time to redraft a criminal statute first enacted in 1533? And if so, cannot the criminal law draftsman be helped by those best informed on the subject—medical doctors—in attempting to classify offenders? Is there any public purpose served by a possible sixty year maximum or even five year *minimum* imprisonment of the occasional or one-time homosexual without treatment, and if so, what is it? Are homosexuals twice as dangerous to society as second-degree murderers—as indicated by the maximum punishment for each offense?[23] Is there any good reason why a person convicted of a single homosexual act with another adult may be imprisoned six times as long as an abortionist,[24] thirty times as long as one who takes indecent liberties with children,[25] thirty times as long as the drunk driver—[26] even though serious personal injury and property damage results, twice as long as an armed bank robber,[27] three times as long as a train robber,[28] six times as long as one who feloniously breaks and enters a store,[29] and 730 times as long as the public drunk?[30]

These questions, and others like them, need to be answered.

Critique," 25 Law and Contemp. Prob. 258–78 (Spring 1960).
For a compilation of state statutes regarding sexual conduct, see: Mueller, Legal Regulation of Sexual Conduct, Table 8–A (1961); 20 California Department of Mental Hygiene, Final Report on California Sexual Deviation Research No. 1, 41–58 (1954); Bensing, "A Comparative Study of American Sex Statutes," 42 J. Crim.L.C. and P.S. 57 (1951); Cory, The Homosexual in America, app. B. (1951); Sherwin, Sex and the Statutory Law, 34–38, 82 (1949); Bowman and Engle, "A Psychiatric Evaluation of Laws of Homosexuality," 29 Temple L.Q. 273, 304–306 (1956).

20. Model Penal Code (ALI proposed official draft, 1962 Sec. 213.2.)

21. N.Y.Penal Code, McKinney's Consol. Laws, c. 40, Secs. 243, 690, 722(8), (1940).

22. French Penal Code, art. 331; German Penal Code, Section 175, 175a, 175b.

23. Maximum punishment for second-degree murder is 30 years. N.C.G.S. § 14–17. Maximum punishment for "Crime Against Nature" is 60 years. N.C.G.S. § 14–177.

24. Maximum punishment is ten years. N.C.G.S. § 14–44.

25. First offense is a misdemeanor for which maximum punishment is two years. N.C.G.S. § 14–202.1.

26. Maximum punishment for first offense is two years. State v. Lee, 247 N.C. 230, 100 S.E.2d 372.

27. Maximum punishment is thirty years. N.C.G.S. § 14–87.

28. Maximum punishment is twenty years. N.C.G.S. § 14–88.

29. Maximum punishment is ten years. N.C.G.S. § 14–54.

30. Maximum punishment generally is thirty days. N.C.G.S. §§ 14–334 and 14–335.