Joseph Henry **HARRIS**, Appellant,

v.

**STATE** of Alaska, Appellee.

No. 958.

Supreme Court of Alaska.

Aug. 8, 1969.

3. 388 P.2d 813 (Alaska 1964).

Roger W. DuBrock, of Christianson & DuBrock, Sitka, for appellant.

**640**

Charles Cranston, Asst. Atty. Gen., Harold W. Tobey, Dist. Atty. and Thomas J. Aron, III, Asst. Dist. Atty., Juneau, for appellee.

Before NESBETT, C. J., and DIMOND, RABINOWITZ, BONEY, and CONNOR, JJ.

## OPINION

CONNOR, Justice.

Appellant was convicted of the "crime against nature"[1] by a verdict of the jury which tried his case.

He brings this appeal on the ground that the statute under which he was tried and convicted is cast in such vague terms that it is unconstitutional and void under the federal and state due process clauses.[2] He appeals from an instruction to the jury. He also appeals a ruling by the trial court which limited a certain line of cross-examination of a witness and limited the introduction of evidence by appellant's counsel in an attempt to impeach the witness by a showing of bias.

■ Appellant did not challenge the indictment in the proceedings below. But if the statute under which appellant was indicted is unconstitutional, it follows that the indictment and judgment of conviction would be vitiated and we should reverse un-

der the plain error rule.[3] Similarly, appellant did not object to the jury instruction on which he specifies error, but he argues that the plain error therein requires reversal.

The indictment charged that on August 17, 1967, at or near Juneau, Alaska, the appellant " * * * did wilfully, unlawfully and feloniously commit a crime against nature by forcibly inserting his penis into the rectum of [the victim] against the will of [the victim], which is in violation of AS 11.40.120."

At trial it was proved that appellant held the victim, a male adult of somewhat limited mentality who was intoxicated, on a bed in an apartment where a drinking party had been in progress, and forcibly inserted his penis into the victim's anus. One of appellant's cohorts assisted in the accomplishment of the act by holding and twisting the victim's feet so that he could not free himself from appellant's assaultive efforts. This was done in the presence of other persons who testified at trial.

It is apparent that the trial court considered "the crime against nature" to be the equivalent of the term "sodomy." The instructions to the jury even use the terms interchangeably.[4]

■ It is established that a criminal statute which is so vague and standardless

---

1. AS 11.40.120 provides: "A person who commits sodomy, or the crime against nature, or has unnatural carnal copulation by means of the mouth, or otherwise, either with a beast or human being, upon conviction, is punishable by imprisonment in the penitentiary for not less than one year nor more than 10 years."

2. U.S.Const. amend. XIV, § 1; Alaska Const. Art. I, § 7.

3. Crim.R. 47(b).

4. No. 7: "As to Count I of the Indictment against the defendant, Joseph Henry Harris, the law of Alaska provides that 'a person who commits sodomy, or the crime against nature, * * * with a * * * human being * * *' is guilty of a crime.

"The essential elements of the crime of Crime Against Nature which the State must prove are:

(1) That on or about the time and place alleged the defendant committed an act upon the body of [the victim].
(2) That the act committed was sodomy or a crime against nature.

"If you find from the evidence, beyond a reasonable doubt, that the State has proved each of the essential elements of the charge in Count I of the Indictment, then you should find the defendant guilty, but if you have a reasonable doubt as to whether all of the essential elements have been proved, then you should find the defendant not guilty."

No. 11: "When the crime is committed upon the person of a human being, the crime against nature consists of the penetration of the anus of one person by the sexual organ of another."

No. 13: " 'Sodomy' as used in these instructions, is defined as copulation between males by the anus."

as to not give fair warning of the acts prohibited by it is a deprivation of due process of law under the 14th Amendment of the United States Constitution. In Lanzetta v. New Jersey, 306 U.S. 451, 452, 59 S.Ct. 618, 83 L.Ed. 888 (1939), the court struck down a statute which declared criminal " * * * [a]ny person not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime * * *." [5] In striking down the statute the court said:

"No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." 306 U.S. 451, 453, 59 S.Ct. 619.

Among the underlying reasons for the void for vagueness doctrine is not merely the notion of fair warning but a legitimate concern that a statute too broad in reach may be used as an instrument of oppression by those entrusted with its enforcement. As pointed out in Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L. Ed.2d 447 (1966), it must not leave judges and juries free to decide in each case, without legally fixed standards, what conduct shall be deemed prohibited. We cannot allow criminality to depend only upon the moral sentiment or idiosyncracies of the tribunal before which a defendant is tried. Vague terms in a criminal statute, if permitted to stand, might be used to cover varieties of conduct not ordinarily regarded as criminal by vast portions of the public affected by it.

"The vice of vagueness in criminal statutes is the treachery they conceal either in determining what persons are included or what acts are prohibited. Words which are vague and fluid * * * may be as much of a trap for the innocent as the ancient laws of Caligula." [6]

Appellant points out that the term "crime against nature" has never been construed authoritatively in Alaska, that it has been construed in other jurisdictions to either include or exclude a variety of physical acts, and that it is not possible, therefore, to know what the term means as a matter of American common law. He argues that the demonstrable imprecision of the term provides the very reason for the statute being void for vagueness. He urges that under the candor currently displayed in American life it should be possible to specify in plain terms what sexual conduct shall be deemed a criminal offense and what shall be permitted.

■ Where a statute makes use of the name of a crime, without further definition and without the context indicating otherwise, it is traditional to look to the common law definition of the crime to determine its meaning.[7]

We are confronted then with the inquiry into whether the term "crime against nature" has an ascertainable common law meaning. But even this determination is not entirely dispositive of appellant's case, as there are additional questions to be resolved.

The decisions in other states are in hopeless contradiction about the scope of the term "crime against nature." Some courts have limited it to anal copulation with mankind or beast, effected by means of the male penis.[8] Others have construed the term to include any act of bestial or unnatural copulation.[9] Some courts have held

5. See also Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

6. United States v. Cardiff, 344 U.S. 174, 176, 73 S.Ct. 189, 190, 97 L.Ed. 200 (1952).

7. Boone v. United States, 235 F.2d 939 (4th Cir. 1956); Hite v. United States,

168 F.2d 973 (10th Cir. 1948); Bosel v. State, 398 P.2d 651 (Alaska 1965).

8. Commonwealth v. Poindexter, 133 Ky. 720, 118 S.W. 943 (1909); State v. Morrison, 25 N.J.C. 534, 96 A.2d 723 (1953).

9. Parris v. State, 43 Ala.App. 351, 190 So.2d 564 (1966); State v. Cyr, 135 Me. 513, 198 A. 473 (1938); State v. Har-

that acts of fellatio and cunnilingus are included;[10] other courts have excluded these acts.[11]

The main cleavage between the various courts is whether "the crime against nature" was a common law term of limited meaning, referring only to anal penetration, or whether it comprehends more than the common law notion of sodomy, thereby allowing a broader interpretation to fulfill a presumed legislative intent. It has even been asserted that the term "crime against nature" did not cover oral-genital activity in English law because such conduct was not known in England during the formative era of early common law. It is said that had such conduct existed, it would surely have been condemned by the courts in England, and this provides a reason for an expansive reading of the term "crime against nature" in American law.[12] Such reasoning exhibits an incredible naivete. Surely these forms of conduct are as old as the human race. No reason has been advanced to explain why people in medieval England were miraculously exempted from instinctual impulses common to the rest of mankind.[13]

The confusion in American case law is compounded by the unwillingness of the courts in many instances to discuss the factual situation with any meaningful precision. The subjects of "sodomy" and "crime against nature" are said by many authorities to be so loathsome that they should be discussed only in language which is enigmatic to the point of deliberate obscurantism. Many of the cases merely assert, without discussing any precedents, that certain acts have always been considered within the prohibitions of the statute. Even Blackstone is of little help on what was meant by the term in the Eighteenth Century or earlier. Rather than discuss the elements constituting the offense, he merely labels it "the infamous crime against nature," declares that it is against the express law of God, and states his reluctance

"to dwell any longer upon a subject the very mention of which is a disgrace to human nature. It will be more eligible to imitate in this respect the delicacy of our English law, which treats it, in its very indictments, as a crime not fit to be named; 'peccatum illud horribile, inter christianos non nominandum (that horrible crime not to be named among Christians).' "[14]

These were the sentiments of an earlier age. Perhaps there was then some common understanding of the types of conduct condemned, although even that proposition becomes doubtful when one surveys the amorphous rulings of American courts over the last century. In today's more secular era the sodomy statutes and other statutes regulating sexual conduct have come under heavy critical attack, part of it directed toward legislative change and part of it directed to the vagueness or unconstitutionality of the various statutes themselves.[15]

ward, 264 N.C. 746, 142 S.E.2d 691 (1965); Roberts v. State, 57 Okl.Cr. 244, 47 P.2d 607 (1935).

10. State v. Maida, 96 A. 207 (Del.Ct.Gen. Sess.1915); Lason v. State, 152 Fla. 440, 12 So.2d 305 (1943); State v. Townsend, 145 Me. 384, 71 A.2d 517 (1950); Ex parte DeFord, 14 Okl.Cr. 133, 168 P. 58 (1917).

11. State v. Potts, 75 Ariz. 211, 254 P.2d 1023 (1953); State v. Murry, 136 La. 253, 66 So. 963 (1914); People v. Schmitt, 275 Mich. 575, 267 N.W. 741 (1936); State v. Hill, 179 Miss. 732, 176 So. 719 (1937); Bennett v. Abram,

57 N.M. 28, 253 P.2d 316 (1953); Prindle v. State, 31 Tex.Cr.R. 551, 21 S.W. 360 (1893).

12. Herring v. State, 119 Ga. 709, 46 S.E. 876 (1904).

13. Ploscowe, Sex and the Law 198 (N.Y. 1951).

14. Blackstone, Commentaries on the Laws of England 215 (Jones ed. 1916).

15. Evans et al, "The Crimes Against Nature," 16 Journal of Public Law 159 (1967); Goodman, "The Bedroom Should Not Be Within the Province of the Law," 4 Calif.West.L.Rev. 115 (1968); Hefner, "The Legal Enforcement of Morality," 40

In State v. Sharpe, 1 Ohio App.2d 425, 205 N.E.2d 113 (1965), the Ohio court was confronted with the term "unnatural sexual act," a term which can be considered a rough equivalent of the "crime against nature."

The court said:

"The sociological and biological range of sex acts is almost infinite, going from so-called Freudian impulses, alleged by some to exist in all human behavior, to the viewpoint that all sex acts which do not lead to the production of offspring are unnatural. Disregarding these extreme viewpoints, it is yet apparent that many sex acts which may be logically classified as unnatural have widespread acceptance and frequent use. By way of example: Certain types of birth control are obviously unnatural; also, the practice of artificial insemination, although rare and frequently criticized, would certainly not be intended to be a criminal act under this statute, albeit it is obviously unnatural. Various types of sex acts useful in or even required for medical diagnostic practices are equally unnatural. Depending upon laws in existence in most states but varying distinctly between them, such things as intercourse within certain proscribed age limits, incest depending upon a varying degree of relationship, and, possibly in some state, even miscegenation, are considered both unlawful and unnatural.

"While these examples could probably be multiplied, they are sufficient to demonstrate the uncertainty and vagueness inherent in this statute and, along with it, the impossibility of its reasonable application." 205 N.E.2d 113, 114.

The court stated that even if the conduct charged was the solicitation of an act of sodomy, it would not save the statute from its inherent vagueness. The statute would still fail to give a positive guide to the public, prosecutors, or the police concerning the particular acts prohibited. The court particularly noted that it is feasible to spell out in specific terms the conduct which the legislature may want to prohibit. This is another factor which may serve to invalidate a statute in the area of sexual conduct.

In Perkins v. North Carolina, 234 F. Supp. 333 (D.C.W.D.N.C.1964), a federal court dealt with a conviction under a statute prohibiting "the abominable and detestable crime against nature, with mankind or beast." Because a federal court is required to apply the substantive law of a state on questions of state law, the court in *Perkins* felt bound by the settled judicial construction of the statute by the state judiciary as making the scope of the statute explicit. It stated:

"If the statute were a new one, it would be obviously unconstitutional for vagueness. The former concern for the feelings of those reading the statute has yielded to the necessity that an indicted person know of what he is charged. Euphemisms have no place in criminal statutes. But this is not a new statute, and it has been interpreted many times by the North Carolina Supreme Court. Although the court has said that it means much more than it meant at common law or as an enactment during the reign of Henry VIII, its decisions have made equally clear that crime against nature does not embrace walking on the grass.

\* \* \* \* \* \*

"The obviously vague statute must be read as if it incorporates the judicial interpretations placed upon it by the Supreme Court of North Carolina, and with those interpretations added, it is not unconstitutionally vague." 234 F.Supp. 333, 336.

U.Colo.L.Rev. 199 (1968) ; Hollis, "Criminal Law—Sexual Offenses—Sodomy—Cunnilingus," 8 Natural Resources Journal 531 (1968); Johnsen, "Sodomy Statutes—A Need for Change," S.D.L.Rev. 384 (1968) ; Jones, "Sodomy—Crime or Sin?" 12 U.Fla.L.Rev. 83 (1959) ; Ploscowe, Sex and the Law, supra, note 13, pp. 195–215; Spence, "The Law of Crime Against Nature," 32 N.C.L.Rev. 312 (1954).

In Alaska we have no judicial gloss of the statutory term "crime against nature" by which to rescue it from the realm of nebulosity.[16] Looking to decisions of other states is of no great help in determining what should be the ultimate scope of the statute.[17]

The gist of the arguments against various statutes regulating sexual behavior is that they reach beyond the necessary protection of society from harm and intrude upon individual freedom, to which man has a fundamental right. It is argued that it is improper to impose purely religious beliefs upon others by means of the criminal law when those beliefs have no demonstrable value in protecting the secular, social, economic, and governmental order.[18] These arguments to a large extent reflect one of the basic doctrinal tenets of John Stuart Mill, who stated:

"The only purpose for which power can rightfully be exercised over any member of a civilized community against his will is to prevent harm to others.

"His own good either physical or moral is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because it will be better for him to do so, because it will make him happier, because in the opinions of others, to do so would be wise or even right."[19]

Like many succinct statements, Mill's doctrine requires considerable exposition in order to know the limits of its application.[20] But it represents a type of libertarian thought which has had a profound influence on public policy during the last century.

With the expansion of the concept of individual freedom in our society, as exemplified in the exercise of government and the trends of our constitutional law, there has been a corresponding decrease of religious beliefs as determinants of social and legal principles. The emphasis today is on religious freedom, not on a tyranny of religious ideas over persons to whom they are unacceptable. Coupled with this there has been the acquisition of a vast storehouse of

16. The decisions of territorial times, Hutson v. United States, 16 Alaska 485, 238 F.2d 167 (9th Cir. 1956), and Christy v. United States, 17 Alaska 107, 261 F.2d 357 (9th Cir. 1958), cert. denied 360 U.S. 919, 79 S.Ct. 1438, 3 L.Ed.2d 1535, both concern carnal copulation by means of the mouth. In neither case was there an attack on the constitutionality of the statute.

17. AS 11.40.120 has not been changed in substance since the adoption of Carter's Code, ch. 7, sec. 130, in 1900. The latter provision was taken directly from the Oregon statute, Hills Ann.Laws § 1874. The Oregon court did not have occasion to interpret its statute until State v. Start, 65 Or. 178, 132 P. 512, 46 L.R.A.,N.S., 266 (1913), in which it held that any penetration of the virile member into any orifice of the human body except the vaginal opening of a woman is within the statute. Thus, there were no settled constructions of the statute at the time of its adoption for Alaska.

18. In a lucid exposition, Harris, "Private Consensual Adult Behavior: The Requirement of Harm to Others in the Enforcement of Morality," 14 U.C.L.A.L. Rev. 581 (1967), the author distinguishes between harm which is "criminable," i. e., subject to prohibition at the option of the lawmaker, and harm which is so insubstantial that it should not even be considered within the realm of legal control. He also discusses some of the constitutional bases on which excessive legislation of morality can be checked: (1) separation of church and state, (2) substantive due process, and (3) the right to privacy.

19. Mill, "On Liberty" (1859), 25 Harvard Classics 203–204 (1961).

20. Mill limits the stated principle to persons in the maturity of their faculties. In an important corollary he derives a liberty of combination among individuals, following from the liberty of each individual. He states it as a
" * * * freedom to unite, for any purpose not involving harm to others: the persons combining being supposed to be of full age, not forced or deceived.
"No society in which these liberties are not, on the whole, respected, is free, whatever may be its form of government; and none is completely free in which they do not exist absolute and unqualified." Id. at 206–207.

scientific, statistical, and psychological data about the sexual nature and behavior of man.

The epochal work of Sigmund Freud, the taxonomic studies of Alfred Kinsey, and the work of countless others, despite the controversy over their theories and conclusions, have nevertheless created a social and intellectual climate in which some of the revolutionary ideas of a generation ago have become the commonplaces of today.

A re-examination of our entire regulation of sexual behavior by the criminal law may well be in order. The courts cannot, of course, perform such a comprehensive task, as it is beyond the capabilities of only the judiciary. But the widening gap between our formal statutory law and the actual attitudes and behavior of vast segments of our society can only sow the seeds of increasing disrespect for our legal institutions.[21]

The very term "crime against nature" implies that an examination of nature can supply the standard of conduct. But the "nature" referred to in many traditional legal authorities really reflects a type of natural law thinking which was based on religious beliefs. Blackstone makes this plain when he refers to the crime against nature being against the express law of God.[22]

The natural law concept found in many of the judicial authorities on this subject implicitly refers to the idea of a settled rule, derivable by reason and cognizable to all persons of common understanding. If such a rule of conduct can be perceived readily there is, of course, no need to define the offense with any further specificity. But the problem then presented is contained in the question: From what sources of knowledge do we obtain the content of natural law?

Man is a creature of nature, yet he engages in conduct which is approved in some cultures and disapproved in others. Who is to say which form of conduct represents most closely the pattern of nature? If natural law is merely a camouflage for some imprecise notion of religious law or moral law derived from religion, then we ought to abstain from uncritically importing religious beliefs into a secular legal system which is to apply to all classes of society. As Mr. Justice Holmes put it:

> "The jurists who believe in natural law seem to me to be in that naive state of mind that accepts what has been familiar and accepted by them and their neighbors as something that must be accepted by all men everywhere. * * *
>
> * * * * * *
>
> "Men to a great extent believe what they want to—although I see in that no basis for a philosophy that tells us what we should want to want."[23]

■ We cannot derive from the natural law a meaningful set of values and criteria by which to breathe life into the term "crime against nature." We conclude that natural law thinking, at least in this instance, does not provide a standard on which to base decision.

■ The refusal to adopt a natural law technique in interpreting this statute does not mean a rejection of a common morality as a powerful source of positive law. But we should avoid the fallacy that a rule of morality is necessarily a rule of law, or that the morality of some groups is, without more, entitled to legal enforcement. On many subjects there is widespread agreement and almost no division of society

---

21. As Kinsey points out, if all infractions of sexual laws were punished, 95 per cent of the male population would have to be convicted of a crime at one time or another, and a majority of the males would be in the category of repeated offenders. Kinsey, Pomeroy & Martin, Sexual Behavior in the Human Male 390–393 (Philadelphia 1948). See also Kinsey, et al., Sexual Behavior in the Human Female 259–263, 366–370 (Philadelphia 1953).

22. Blackstone, Commentaries on the Laws of England 216 (Jones ed. 1916).

23. Holmes, "Natural Law," 32 Harv.L. Rev. 40, 41, 43 (1918).

about the propriety of legal control of human behavior. On other subjects there is such sharp division of opinion that only the pluralistic nature of our democratic system, in which the shared belief in mutual tolerance takes precedence over differences in moral belief, prevents a destructive divisiveness in our social order.

Reflection about the nature of man is central to the formulation of ethical standards. It would be unreasonable to deny the vast interplay of moral ideas and the positive law, or the purposive element in legal interpretation. It would be equally irrational to ignore the role of religious belief in shaping the moral attitudes of society. There well may be a natural law of "minimal content" as stated by Professor Hart.[24] It is not our task to decide such recondite questions. But the trouble with using a presumed law of nature in the present case is that it would result in a wholesale adoption of a rule premised on divine revelation, not subjected to rational analysis. As Professor Glanville Williams has stated,

> "[I]f moral rules are to be externalized and enforced by law, they should so far as possible be those that human beings in the mass are able to comply with, without excessive repression and frustration and without overmuch need for the actual working of the legal machine." [25]

In the current debate about legal regulation of sexual conduct, the main issue seems to be not the age-old dialectic of natural law against positivism; rather, it is the question of enforcing a specifically religious belief upon all of society. Among the important events engendering the debate has been the 1955 proposal by the American Law Institute Model Penal Code that there should not be prohibition of any sexual practices except those involving force, adult corruption of minors, or offenses committed in public.[26]

A great debate also commenced with the Wolfenden Report in 1957 in Great Britain, concerning homosexual offenses and prostitution. The rationale underlying the Wolfenden Report was stated with concision:

> "Unless a deliberate attempt is to be made by society, acting through the agency of the law, to equate the sphere of crime with that of sin, there must remain a realm of private morality and immorality which is, in brief and crude terms, not the law's business." Committee on Homosexual Offenses and Prostitution, Report, Cmd. No. 247 (1957), at 24.

The report was attacked in a widely publicized lecture by Lord Devlin in 1959,[27] which in turn touched off a series of exchanges by eminent legal scholars, among them Professor H. L. A. Hart.[28] It would be beyond the scope of this opinion to discuss many of the philosophic and practical aspects of the debate, which is still going on, as it would convert this opinion into an extended treatise.[29] But the

24. H.L.A. Hart, The Concept of Law 189–95 (Oxford 1961).

25. Williams, The Sanctity of Life and the Criminal Law, at 232 (N.Y.1957).

26. Model Penal Code § 207.5, comment at 277 (Tent.Draft No. 4, 1955). The recommendation was based on the grounds, among others, that "No harm to the secular interests of the community is involved in atypical sex practice in private between consenting adult partners. This area of private morals is the distinctive concern of spiritual authorities."

27. Lord Devlin, The Enforcement of Morals (Oxford 1959).

28. H.L.A. Hart, Law, Liberty, and Morality (Stanford 1963); H.L.A. Hart, The Concept of Law (Oxford 1961), 181–195; H.L.A. Hart, "Positivism and the Separation of Law and Morals," 71 Harv.L.Rev. 593 (1958).

29. The dimensions of the debate can be perceived by examining Bodenheimer, "The Case Against Natural Law Reassessed," 17 Stan.L.Rev. 39 (1964); Breckenridge, "Legal Positivism and the Natural Law: The Controversy Between Professor Hart and Professor Fuller," 18 Vand.L.Rev. 945 (1965); Lord Devlin, "Mill on Liberty in Morals," 32 U.Chi.L.Rev. 215 (1965); Dworkin, "The Model of Rules,"

position of Lord Devlin, that the state should enforce a Christian or Judeo-Christian morality, based on divine revelation, has lost ground even in Great Britain, which has an established church.[30]

The current approach to defining criminal conduct is that of specifying in objective terms the acts and intent prohibited. There are many instances in which the law resorts to the general understanding of the community as the standard of legal result. But where the conduct to be prohibited by a criminal statute is capable of objective definition by language descriptive of precise physical acts and events, it simply will not do to use language so ambiguous as to be capable of expansion or contraction at the whim of the reader.

■ Certainly the legislative branch of government can delimit and proscribe specific types of sexual conduct which have a harmful effect upon the valid functioning of a civilized society. With this we can have no quarrel. But the term "crime against nature" simply will not pass muster under the constitutional standards we must apply. Neither the delicate sensibilities of William Blackstone nor the hushed euphemisms of the Victorian era can justify the use of imprecision in penal legislation. Nor can they govern our determination of whether a statute is valid under current American constitutional standards. We declare the term "crime against nature" void for vagueness.[31]

Our conclusion that the "crime against nature" is fatally vague does not, however, dispose of the case at bar.

We have noted that the court below equated the term "sodomy" with "crime against nature," as it submitted instructions to the jury which imply that the two are identical. While the indictment referred only to a "crime against nature" and to the statutory section number AS 11.40.-120, it stated the physical facts constituting the alleged offense of sodomy. It is argued that it was improper to submit the case to the jury under the term "sodomy" because the statute creates three distinct offenses, namely, (1) sodomy, (2) the crime against nature, and (3) unnatural carnal copulation by means of the mouth, or otherwise. Appellant claims that he was charged only with the "crime against nature," an invalid offense, and the jury could not render a verdict on any other offense. We disagree.

■ The gratuitous use of the words "crime against nature" will not of itself invalidate the indictment if, without those words the indictment sets forth acts, occurrences and circumstances sufficiently to

35 U.Chi.L.Rev. 14 (1967); Dworkin, "Lord Devlin and the Enforcement of Morals," 75 Yale L.J. 986 (1966); Fuller, "Positivism and Fidelity to Law—A Reply to Professor Hart," 71 Harv.L.Rev. 630 (1958); H.L.A. Hart, "Social Solidarity and the Enforcement of Morality," 35 U.Chi.L.Rev. 1 (1967); Hughes, "Morals and the Criminal Law," 71 Yale L.J. 662 (1962); Sturm, "Lon Fuller's Multidimensional Natural Law Theory," 18 Stan.L.Rev. 612 (1966). Finally we encounter the suggestion that our verbal tools are inadequate to construct *theories* of justice and that we should instead analyze the components of our *sense* of justice: Ehrenzweig, "Psychoanalytical Jurisprudence: A Common Language For Babylon," 65 Columbia L.Rev. 1331, 1355 (1965). See also Redmount, "Psychological Views In Jurisprudential Theories," 107 U.Pa.L.Rev. 472 (1959).

30. Lord Devlin's thesis suffered a bad blow when the Anglican church itself came out for abolition of criminal prohibitions on homosexual behavior between consenting adults, on attempted suicide, and suicide. Note, Evans et al., "The Crimes Against Nature," 16 Journal of Public Law 159, 188 (1967); also Church of England Moral Welfare Council, "Sexual Offenders and Social Punishment" (1956); Report of a Committee appointed by the Archbishop of Canterbury, "Ought Suicide to be a Crime?" (1959); discussed in Hughes, "Morals and the Criminal Law," 71 Yale L.J. 662, 681 (1962).

31. While we do not have before us "unnatural carnal copulation by means of the mouth, or otherwise, either with a beast or human being," plainly an attack on that clause could be made on the ground that it contains the same infirmity as the "crime against nature."

state the essential elements of the offense, to apprise the defendant of the nature of the charge against him, and to allow him to prepare his defense to the indictment.[32] A mere misnomer of the crime, not operating to the prejudice of the accused, does not render the indictment fatally defective if it otherwise charges the offense.[33] The erroneous language will, in such cases, be ignored as surplusage.[34] In the case at bar the acts were charged with specificity. The case was submitted to the jury under the term "sodomy" which appears in the same statutory section as the term used in the indictment.

Appellant has not demonstrated, in these circumstances, that actual prejudice was inflicted upon him by the terminology of the indictment and the instructions. Admittedly the indictment is inartfully drawn, but it fulfills the minimum standards discussed above. While a criminal case should not be submitted to the jury on instructions concerning an offense not charged, here the question of anal penetration was clearly charged in the indictment and presented to the jury for its factual determination. The evidence submitted to the jury was such that appellant was either guilty of a forcible, assaultive penetration or was not guilty at all. His only factual defense was one of alibi, which probably collapsed under cross-examination of the alibi witness, as the jury implicitly rejected the defense.

If we had before us a question of applying the term "sodomy" to various marginal areas of sexual conduct, at least some of us might be confronted with a grave problem of statutory interpretation or of constitutional law. If the case at bar concerned private, consensual conduct with no visible impact upon other persons, at least some of us might perceive a right to privacy claim as one of the penumbral emanations of the Bill of Rights and the 14th Amendment due process clause,[35] or simply as one of the unenumerated rights guaranteed by the 9th Amendment.[36] But the case at bar concerns an unconsented to penetration of the male anus by a male penis. Accordingly, we must consider whether the statute is sufficiently certain as to some modes of sexual conduct, whether appellant's conduct is within such a prohibited zone, and whether the indictment supports the conviction. Or, to put it another way, does "sodomy" clearly cover unconsented to rectal intercourse, regardless of whatever marginal uncertainty there may be about the scope of that term?

We advert to the question of whether "sodomy" is a term of sufficient precision to withstand constitutional attack. Sodomy appears originally as part of the Hebraic law, taking its name from the practices reputedly indulged in by the inhabitants of Sodom and Gomorrah.[37] Unfortunately, the biblical text is not explicit about the various types of conduct for which the Cities of the Plain were visited with fire and brimstone, but other portions of the Old Testament prohibit sexual congress between man and man in general terms.[38]

It appears that during medieval times sodomy was considered a religious offense, punishable only in the ecclesiastical courts.[39] There may have been occasions

32. Crim.R. 7(c) ; 4 Wharton on Criminal Law § 1770 (1957).

33. Stewart v. State, 438 P.2d 387, 391 (Alaska 1968).

34. Wharton, supra, note 32, §§ 1767, 1770; Chargois v. United States, 267 F.2d 410 (9th Cir. 1959) ; Tynan v. United States, 5 Alaska Fed. 211, 297 F. 177 (1924).

35. Griswold v. Connecticut, 381 U.S. 479, 483, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

36. Goldberg, J., concurring in Griswold v. Connecticut, id., at 493–494, 85 S.Ct.

1678. In Cotner v. Henry, 394 F.2d 873 (7th Cir. 1968), the defendant had been convicted of a sodomous act under Indiana law, committed with his wife. The court declared that the right to privacy announced in Griswold clearly covers private, consensual relations between married persons, and reversed the defendant's state court conviction.

37. Genesis 19:24; Ezekiel 16:49.

38. Leviticus 18:22.

39. Goodman, supra, note 15, 115.

where the offender was turned over to the civil authorities for punishment, but the extent of this is unclear historically.[40] Most authorities conclude that sodomy was not an offense at early common law, and became punishable by the temporal courts only after the Statute of Henry VIII,[41] which outlawed buggery.[42] Pollock and Maitland [43] contend that the preamble of the statute demonstrates that there was no common law offense before the enactment of the statute, and that ecclesiastical punishment was both rare and lenient.[44]

Subsequent English cases make plain that the terms "sodomy" and "buggery" included at least anal penetration between man and man, but did not include oral copulation. Rex v. Jacobs, Russell & Ryan 331, 168 Eng.Rep. 830 (1817).

The Statute of Henry VIII, the Statute of Elizabeth, and the interpretations of those statutes by the English courts constitute part of the common law which is to be considered either incorporated into American law, or a source of law for judicial interpretation of statutory terms. As Mr. Justice Story put it,

"These statutes being passed before the emigration of our ancestors, being applicable to our situation, and in amendment of the law, constitute a part of our common law." Patterson v. Winn, 30 U.S. (5 Pet.) 233, at 241, 8 L.Ed. 108 (1831).

 Against this backdrop of our Anglo-American legal development it is clear that appellant's conduct is within the prohibitory ambit of the statute, however lacking in clarity the term "crime against nature" may be, and however disparate are the judicial interpretations in our sister states. We hold that the statutory term "sodomy" as it concerns the act committed by appellant, is not void for vagueness. On this branch of the case appellant's conviction must be affirmed. However, we should remand for the entry of an amended judgment reflecting a conviction of sodomy, not of a crime against nature.

Appellant's next point on appeal is that the trial court erred in limiting his counsel's efforts to impeach a witness for bias. Appellant has failed to persuade us that the trial court erred in refusing to admit the indictment offered by appellant for purposes of showing bias on the part of a prosecution witness. Nor is it shown that the court, by limiting appellant's attempt to impeach the witness, abused its discretion in controlling the scope of cross-examination.[45] We find no error.

For the reasons stated, the judgment of conviction is affirmed. However, we remand for the entry of an amended judgment reflecting a conviction for the crime of sodomy and not a crime against nature.

NESBETT, Chief Justice (concurring in the result).

I concur with the result.

---

40. See 2 Pollock & Maitland, History of English Law 554 (Cambridge 1895).

41. 25 Henry VIII, c. 6 (1533).

42. The statute was repealed during the reign of Bloody Mary, 1 Mary, c. 1 (1553), 1st Session, but was reenacted upon the ascension of Elizabeth I, 5 Eliz., c. 17 (1562).

43. Supra, note 40.

44. The operative language of the statute is: "Forasmuch as there is not yet sufficient and condign punishment appointed and limited by the due course of the laws of this realm, for the detestable and abominable vice of buggery committed with mankind or beast: (2) it may therefore please the King's highness, with the assent of his lords spiritual and temporal, and the commons of this present parliament assembled, That it may be enacted by authority of the same that the same offense be from henceforth adjudged felony, and such order and form of process therein to be used against the offenders as in cases of felony at the common law.; * * * " 25 Henry VIII, c. 6 (1533).

45. Fajeriak v. State, 439 P.2d 783, 785 (Alaska 1968) ; Pedersen v. State, 420 P.2d 327, 337 (Alaska 1966).

DIMOND, Justice (concurring in the result).

I concur with the result to the extent that the judgment of conviction is affirmed.