Gerald A. MAHLE, Appellant,

v.

STATE of Alaska, Appellee.

No. 129.

Supreme Court of Alaska.

May 2, 1962.

George F. Boney, Anchorage, for appellant.

George N. Hayes, Dist. Atty., Dorothy Awes Haaland, Asst. Dist. Atty., Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

The defendant, Gerald A. Mahle, appeals from his conviction on two counts of an indictment charging him with burglarizing the Sears, Roebuck Store at Mt. View, Alaska, on or about March 3, 1960, and stealing the store's safe and its contents of currency and checks. Jointly indicted with Mahle was one George C. Groff who, at the time of Mahle's trial, had already plead guilty to the offenses charged and had been placed on probation under a sentence of

three years. He testified as a witness for the state in the trial of this case.

We shall consider first the issue most extensively argued by the defendant, namely, that the trial court erred in failing to require an *in camera* examination of any summaries in the police reports of certain pretrial oral statements given to the police by two of the state's witnesses, Betty Jordan and Marvin F. Mardock. Such an examination, the defendant contends, is necessary to a proper determination of whether the defendant was entitled to inspect the police reports or summaries, in whole or in part, under the provisions of the Alaska statute designated as chapter 103 SLA 1960.

The statute in question relates to demands by the defense for the production of statements and reports of state's witnesses in criminal prosecutions. We quote paragraphs "b" and "e", because their provisions are specially applicable here:

"b. After a witness called by the state has testified on direct examination, the court shall, on motion of the defendant, order the state to produce any statement (as hereinafter defined) of the witness in the possession of the state which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use. * * *

"e. The term 'statement,' as used in paragraphs b., c., and d. of this section in relation to any witness called by the state, means:

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the government and recorded contemporaneously with the making of such oral statement."

At the trial, Betty Jordan, manager of the store which had been feloniously entered, testified as to the corpus delicti and Officer Mardock of the Anchorage City Police told of finding at the scene of the crime a claw from a hammer which matched a hammer with a missing claw found in the back seat of a car occupied by the defendant as a passenger. Both witnesses testified that they made oral statements to other police officers assigned to investigate the burglary and larceny but were not able to say whether their statements were recorded.

Defense counsel asked the prosecutor whether he had any "synopsis of statement" of Betty Jordan. The prosecutor replied, "We have police reports"; and, before he could explain, defense counsel cut in with a demand for the reports. The prosecutor then commented that only prior written statements were contemplated under Chapter 103. The court denied the demand. With respect to Officer Mardock, defense counsel likewise demanded any prior statement this witness might have made to other investigating officers, including any summary made by such officers of any oral statement given them by Mardock. This demand was also denied. At this point the prosecutor volunteered the information: "There was no written statement taken from this officer [meaning Mardock]. We had no statement from this officer." A full account of these episodes in the trial is set forth in the margin.[1]

---

1. In the record appears the following account of the trial proceedings relating to the defendant's demand for production by the state of pretrial statements made by the witnesses Jordan and Mardock:

"MR. BONEY: I would like to demand that the prosecutor produce the statement, any statements that he might have, written statements of Miss Jordan pursuant to the Jenks [sic] rule.

"MR. PEASE: The state to the best of my knowledge has no written statement from Miss Jordan. Perhaps you could ask if she gave one.

Our chapter 103 SLA 1960 is practically identical with a 1957 Act of Congress popularly known as the Jencks Act,[2] and it is reasonable to assume that the Alaska Legislature, when it enacted Chapter 103, was familiar with the federal cases decided up to that time under the Jencks Act. We have examined many of the applicable federal cases, both those decided between 1957 and 1960 and those decided since the passage of our statute, and we find ourselves in accord with the view shared by the defendant and the state that the federal cases decided under the Jencks Act should be helpful to this court in its interpretation of the Alaska statute.[3]

■ If there is any doubt as to the defendant's right to examine and use a particular statement, the proper practice is for the trial judge to conduct a preliminary hearing *in camera* to resolve the doubt.[4] In that connection, it may be necessary for him

"CROSS EXAMINATION
"BY MR. BONEY:
"Q Did you ever give a statement to the police?
"A Not a written statement. I gave it in Court last time.
"Q You gave a statement to the Grand Jury?
"A Oral, um-hum.
"Q And that statement was not recorded?
"A I have no idea.
"Q You have—I'd like to—did you ever talk to the State ah, the City police or State police?
"A After the robbery you mean or during it?
"Q After you discovered this matter did you ever give a statement to the city police?
"A Everything was oral.
"Q And did they write it down?
"A I would assume. I don't know.
"Q Do you have any ah, synopsis of statement?
"MR. PEASE: We have police reports but those are not ah—
"MR. BONEY: I'd like to make a demand for the police reports.
"MR. PEASE: It's only statements Your Honor, under our statute is only statements of what witnesses—a prior written statement. This is opening up the police's whole file and ah, it might have a mans [sic] confidential informants in their and such things—
"THE COURT: The demand is denied. You may cross examine.

\*   \*   \*   \*   \*

"CROSS EXAMINATION [of Officer Mardock]
"BY MR. BONEY:
"Q Did you make a report in this case?
"A No sir, the detectives handled that.
"Q Did you sign a statement for the detectives [sic]?
"A No sir.
"Q Did you give them an oral statement?

"A Yes sir, at the time of the investigation.
"Q To whom did you give this statement?
"A To Detectives Jolliker and Peavely.
"Q And did they write down the contents of this statement?
"A I couldn't say whether they did or not.
"Q Did they take notes while you were talking?
"A Not to my knowledge. They took notes throughout the investigation. Whether it was what I said or not I couldn't say.
"Q Did they have a secretary, or a stenographer in the room when you were talking?
"A No sir.
"Q I'd like to make a demand for any statement this witness may have made ah, any oral statement which might have been summarized by the city police and I'd like that summary, if there is one to be extracted from the police files and handed to me for inspection.
"THE COURT: Motion for demand is denied.
"MR. PEASE: I might state that that's my knowledge. There was no written statement taken from this officer. We had no statement from this officer."

2. 71 Stat. 595 (1957), 18 U.S.C.A. § 3500 (a)-(e) (Supp.1961).

3. For excellent treatments of the history, purpose, validity and construction of the Jencks Act see the following: Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); Campbell v. United States, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961); Annot., 5 L.Ed. 2d 1014–1042 (1961).

4. Palermo v. United States, supra note 3, 360 U.S. at 354, 79 S.Ct. 1217, 3 L.Ed. 2d at 1296; Campbell v. United States, supra note 3, 365 U.S. at 92–93, 81 S.Ct. 421, 5 L.Ed.2d at 425–436; United States v. Tomaiolo, 280 F.2d 411 (2d Cir. 1960).

to require extrinsic evidence to determine whether an interview report of a governmental agent is a substantially verbatim recital of an oral statement contemporaneously recorded by the agent.[5]

In the case here for review the prosecutor admitted that the state had reports of police interviews with the witness Jordan.[6] The record is not clear however as to whether the state also had such reports of witness Mardock's oral statement to police officers Jolliker and Peavely, although Mardock testified that those officers "took notes throughout the investigation."[7]

The prosecutor did volunteer the information that there were no *written* statements taken from Mardock—adding, "We had no statement from this officer." Did he mean by this last remark that the state had no reports or summaries of oral statements made by Mardock, or was he merely emphasizing the assertion that no written statements were taken from Mardock? We cannot tell what he meant and we doubt that the trial judge was even interested because it is apparent from the record that he permitted himself to be persuaded by the prosecutor that only written statements given to the police by witnesses prior to

the trial can constitute a "statement" under our statute.

■ We are convinced that the trial court committed error in not requiring the state to produce for *in camera* examination the police reports of the oral statements made to them by the witness Jordan as well as any reports or summaries that may exist of pretrial statements made by Mardock. Ordinarily, for an error of this kind we would not vacate the conviction and order a new trial forthwith, but would remand the case with directions to the trial court to redetermine, consistently with our opinion, the defendant's demand for the production of pretrial statements and reports.[8] However, in this case because of other reversible error appearing in the record, as we shall next point out, we have no alternative but to reverse and remand for a new trial.

The second issue raised by the defendant in his briefs is that it was reversible error for the trial court to refuse to instruct the jury that the witness Clyde Ahern, called by the state, was an accomplice of the defendant in the crimes charged and that his testimony, therefore, required corroboration.

5. Campbell v. United States, supra note 3, 365 U.S. at 92-96, 81 S.Ct. 421, 5 L.Ed.2d at 435-437; United States v. Mc-Keever, 271 F.2d 669, 674 (2d Cir. 1959). In Campbell the Supreme Court ruled that under the circumstances of that case the obligation fell upon the trial court to subpoena, or require the government to subpoena, for *in camera* examination the witness whose testimony would throw light upon the producibility of an interview report demanded by the defendant for examination.

6. See note 1 supra.

7. Ibid.
   It matters not that Mardock was a police officer making an oral report to other police officers of what he had uncovered with regard to the claw from a hammer found at the scene of the crime. Such a report could constitute a "statement" within the meaning of Chapter 103. See Karp v. United States, 277 F.2d 843, 848 (8th Cir. 1960), cert. denied 364 U.S. 842, 81 S.Ct. 80, 5 L.Ed.2d 65 (1960).

8. In Campbell v. United States, cited in note 3 supra, the Supreme Court pointed out that upon remand the trial court should supplement the record with new findings and a new final judgment of conviction, from which an appeal might be taken by the defendant if the court concluded to reaffirm its prior ruling. But, if the trial court concluded that the government should have been required to deliver the report or any other statement to the defendant, the court should vacate the judgment of conviction and accord the defendant a new trial.
   We trust that in the light of our opinion and after a careful study of Chapter 103 and the federal decisions interpreting the Jencks Act, the trial judge in this case will be better able to fairly administer our statute to the end that all relevant and competent reports and statements touching the events and activities to which the state's witnesses, Jordan and Mardock, may testify at the retrial will be made available to the defendant.

Ahern's testimony was important to the state's case because it corroborated the testimony of the defendant Mahle's accomplice Groff that the defendant was present all day and on the evening of March 2, 1960, at the house where the burglary and larceny of the Sears, Roebuck Store property were planned that evening. If Ahern was an accomplice of the defendant either in the burglary or the larceny, or both, as a matter of law under the facts of this case, then the court should have so instructed the jury.[9]

The facts are undisputed that Ahern was present in the house where Mahle, Groff and one Gerald Cox finalized their criminal plans, though "he [Ahern] didn't want to have any part to do with it." He was there when the other three returned to the house with the unopened safe from Sears and proceeded to pry it open; and, at their request, he assisted, "towards the end," in the job of breaking open the safe and disposing of it and its contents. Ahern "got a couple dollars" of the money taken from the safe.

In spite of the facts just stated, the court refused to give the defendant's requested instruction that Ahern was an accomplice as a matter of law.[10] Instead, the court instructed the jury generally on who are regarded as accomplices under the law, the kind of evidence required to corroborate their testimony and how such evidence should be viewed by the jury and then concluded as follows:

"You are accordingly instructed that the testimony of the State witness, George C. Groff, accomplice in the

commission of the crime charged in the indictment in the case now on trial before you, ought to be viewed with distrust.

"If you find that the witness Ahern is also an accomplice, you ought to view his testimony also with distrust."

It is this last sentence of the instruction to which the defendant objected below, and we think rightly so. On the undisputed evidence in the record the court should not have left it to the jurors to decide whether Ahern was an accomplice but should have instructed them that Ahern was an accomplice as a matter of law—certainly with respect to the crime of larceny.

■■■ An accomplice is generally defined as one who in some manner, knowingly and with criminal intent aids, abets, assists or participates in a criminal act.[11] The larceny charged in the indictment is not only as to the safe but also as to its contents of currency and checks. With full knowledge that the safe and whatever it contained had been stolen, Ahern entered into the final asportation and disposition of this property. He voluntarily participated in the completion of the crime by assisting in forcing open the safe, extracting the contents therefrom and then disposing of the safe and its contents. He thus made himself an accomplice in the larceny.[12]

The third issue raised by the defendant is that there was insufficient evidence to corroborate the testimony of the accomplice Groff within the meaning of section 66–13–59 ACLA 1949, and that the trial court, therefore, erred in denying the defendant's

---

9. Cudjoe v. State, 12 Okl.Cr. 246, 154 P. 500, L.R.A.1916F, 1251 (1916); 2 Wharton, Criminal Evidence § 446 (12th ed. 1955).

10. The pertinent part of the defendant's requested Instruction No. 3 reads as follows:
"It is the duty of the Court, in the first instance, where the facts are clear, to determine whether or not a particular person is an accomplice within the meaning of the law. I instruct you, therefore, that the witness, George Groff, and the

witness Clyde Ahern, having willfully participated and assisted in the crimes charged, are deemed to be accomplices as to the defendant Gerald Mahle. * * *"

11. People v. Seiffert, 81 Cal.App. 195, 253 P. 189 (1927); State v. Altwatter, 29 Idaho 107, 157 P. 256 (1916); 2 Wharton, Criminal Evidence § 448 at 230 (12th ed. 1955).

12. See People v. Swoape, 75 Cal.App. 404, 242 P. 1067, 1071 (1925); Reed v. State, 50 Okl.Cr. 287, 297 P. 327 (1931).

motion for judgment of acquittal.[13] Inasmuch as the case will have to be retried for the reasons earlier stated herein, we need not now consider this third error alleged. We do remind the trial court, however, that what we consider to be the meaning of Section 66–13–59 with regard to the kind of evidence required to corroborate the testimony of an accomplice and what we believe to be the respective functions of the trial court and the jury in determining the sufficiency of such evidence, are set forth in our decision in Oxenberg v. State, No. 36, 362 P.2d 893 (Alaska 1961).

The only other question briefed for us by the defendant is whether the court committed reversible error in admitting into evidence certain tools claimed by him to have been seized in an illegal search of the house wherein the burglary and larceny were planned. The tools consisted of a combination tire iron and lug wrench and five screw drivers, and were all of a kind that could have been utilized in the commission of the crimes charged. Markings of paint, similar in color to that on the safe, and some safe insulation were found on the tire iron. The witness Groff identified the tire iron and two of the screw drivers as having been used to open the safe.

It appears that about ten days after the burglary of Sears, Roebuck Store, police officers stopped a car which was being driven at the time by Gerald Cox. With him as a passenger was the defendant Mahle. At the request of the officers, Cox permitted them to search the car and in their search they found, among other things, a claw hammer in the back seat. The hammer was taken to the police station and there matched up with the claw found at the scene of the crime. On the strength of this evidence, the officers went to the house where Cox was living and placed him under arrest.[14] They then searched the house, incidental to the arrest, and discovered the tire iron and screw drivers in question. This house is the same one in which the crimes were planned and the safe was opened.

The defendant contends that the search of the car was illegal because the consent to its search is not clear in the record and that it was actually searched on the pretext that it was being driven under an improper license. The defendant then reasons that, since the search of the car was illegal, the seizure of the hammer was illegal, and that this in turn, under the "poisonous tree" doctrine announced by the United States Supreme Court in Nardone v. United States,[15] caused the arrest of Cox and the attendant search of his house and seizure of the tire irons and screw drivers to be illegal.

Since the defendant's whole argument rests upon the premise that the search of the vehicle was illegal, we turn to the record for an answer. There we read this simple bit of uncontradicted testimony by police officer Anderson:

"Q  Who gave you permission to search the car?

"A  Mr. Cox did."

We find no error in the admission of the tire iron and the screw drivers into evidence. Such objection as there might be to this evidence would go only to its weight, not to its admissibility.

For reasons earlier stated in this opinion the judgment of conviction of the defendant is reversed and the case remanded for a new trial.

13. The motion for judgment of acquittal was made at the close of the state's evidence and, after argument by both parties, was denied by the court. The defendant introduced no evidence.

14. Section 66–5–30 ACLA 1949, provides that a peace officer may, without a warrant, arrest a person when a felony has in fact been committed and he has reasonable cause for believing the person arrested to have committed it.

15. 308 U.S. 338, 341, 60 S.Ct. 266, 84 L. Ed. 307, 312 (1939). The case here cited discusses the taint that attaches to evidence obtained through prior evidence consisting of telephone conversations illegally intercepted by wire tapping.