Michael Allen **TARNEF, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. 1486.

Supreme Court of Alaska.

July 25, 1973.

---

924

Herbert D. Soll, Public Defender, Lawrence J. Kulik, Asst. Public Defender, Anchorage, for appellant.

John E. Havelock, Atty. Gen., Juneau, Monroe N. Clayton, Dist. Atty., Fairbanks, for appellee.

Before RABINOWITZ, C. J., CONNOR, ERWIN and BOOCHEVER, JJ.

## OPINION

BOOCHEVER, Justice.

On the morning of April 25, 1969, there was an apparent arson at the White Swan, a commercial laundry located in Fairbanks. However, because of an effective sprinkler system in the building, little damage was done. Mr. Alvin Martin, who was then owner of the White Swan, had been an arson victim a year earlier when a laundromat he had owned had been totally destroyed by fire. Martin suspected that John R. Eberhard, a competitor of his, had been involved in both fires. Consequently, Martin published a $5,000 reward offer for information leading to the arrest and conviction of the persons responsible for the fire.

In June 1969 the defendant, Michael Allen Tarnef, responded to Martin's ad by calling the listed number and agreed to meet Martin and one William Hagar, manager of the White Swan at the time of the fire. Later that day, Tarnef met Martin and Hagar at the Cushman Street Bridge. Tarnef, using the pseudonym Michael Reily [phonetic] drove around with Martin and Hagar for a period of time and discussed the White Swan fire. Accounts of this conversation offered at trial by the three participants varied considerably.

Martin testified that Tarnef stated that Sam Kelly actually set the fire and that a boy named Stretch was also involved. Tarnef testified that he implicated Sam Kelly, Floyd Stretch and Eberhard as well as a Mr. Sims and Mr. Chisolm, but not himself. Hager, however, testified that Tarnef implicated himself as well as the other persons mentioned above. Martin paid Tarnef $380 for this information. Martin related the above to the Fairbanks Police Department and to Mr. Robert Timlin, a professional arson investigator from Seattle who had been in Fairbanks on the day of the fire at Martin's request.

Martin also contacted Thomas Fenton, a Fairbanks attorney and former district attorney, and asked that he visit Tarnef, who was then incarcerated at Northern Regional Correction Institute on another unrelated charge, and attempt to get a statement from him about the fire. Fenton visited Tarnef at NRCI in July. Fenton testified that in his presence, Martin offered Tarnef legal counsel to represent him, bail, and additional reward money if Tarnef would make a statement. In addition, Fenton testified that he made the following statement to Tarnef:

> Well I said that it was ah—very doubtful whether they would file any kind of case against Tarnef, that the case—that the people that everybody was interested in would be the people who did the hiring of Tarnef to set the fire. And that if they did file a case ah—they—it'd just be a formality I mean there wouldn't be any kind of trial or any prosecution, just to have a case filed against him.

However, Fenton did not succeed in inducing Tarnef to make a statement.

Subsequently, Martin and Hagar visited Tarnef at NRCI several times over the next several months. Then, on February 13, 1970, Timlin, the arson investigator from Seattle, went to NRCI with Hagar and succeeded in obtaining a five-page statement from Tarnef. Tarnef's statement was reduced to writing by Timlin, witnessed by Hagar, and signed by Tarnef.

Tarnef's statement indicated that he was approached by Eberhard, Chisolm and Sims and offered $2,500 to set the White Swan fire. Tarnef admitted making substantial preparations including hiding a number of cannisters of inflammable liquids near the White Swan, but told his employers at the last minute that he wouldn't do the job. The critical admission made by Tarnef was as follows:

> The next night, I was talking with Sam Kelly and asked him if he was interested in making some easy money, and when he said yes, we went over to the Polaris lounge and got a hold of Joe Sims—Joe told him what he had to do and they agreed on terms—at this time I left.

Timlin testified that although Tarnef apparently wanted to bargain that he made Tarnef no promise of leniency and told him that it "was strictly up to the district attorney" whether he would be granted immunity for "turning so called state's evidence." Timlin also stated that he advised Tarnef of his constitutional rights:

A: After the interview with Mr. Tarnef and prior to the time that the statement was reduced to writing, I informed Mr. Tarnef of his—constitutional rights.

Q. What do you mean by his constitutional rights?

A: That he had a right not to say anything and that if he did say something it could be used against him, that he had a right to an attorney, that if an attorney—if he did not have an attorney one could be provided. Ah—at this point in time Mr. Tarnef said ah—'hold' or 'whoa' or something like that, 'that kind of talk scares me' or 'bothers me'. And I told him that even though I was no longer connected with law enforcement, I still felt that because of my past connection that I should so advise him on this stuff, and we went on with the statement.

Tarnef's account of his conversation with Timlin was considerably different.

He testified that Timlin told him that no charges would be brought against him, he would get a $5,000 reward, and that his bond would be furnished by Martin. Tarnef stated that much of the wording of the statement was not his own, but was furnished by Timlin. Tarnef further testified that he knew nothing about the fire except what was related to him by Sam Kelly and, moreover, the only reason he gave the "false" statement was because he thought it could not be used against him since Timlin had not advised him of his rights:

A. When he—after he said that he was working for the ah—this insurance company as a private investigator, he said before we get started on any ah—business, he said I have something I'd like to read to you and I said—before he said anything else I said that if that has something to do about warning me or something, I said I—you know, we'll just forget the whole thing right now. And Mr. Martin who was present with Mr. Hagar and Mr. Timlin that morning because he had to fly out —he flew out later on that afternoon. And Mr. Martin just said yeah that's all right and Mr. Timlin said well, he said I—I don't have to read 'em to you then everything's all right. But he never did, he never advised me of anything.

Q. Well, what did you mean about that if you were gonna get involved, then advise you of your rights, you'd forget the whole thing?

A. Well, sure because then he could turn around you know, regardless, that would be the only thing that would scare me into giving it, you know, in other words, if I—if I did give the statement even though he did give me all those promises and everything I figured that the man never did advise me of anything and that if he did try to turn me around I wouldn't have anything to lose by it. In other words, they still

wouldn't be able to, you know, to use it.

Tarnef moved to suppress the statement and a suppression hearing was held in February 1971. The motion was denied and Tarnef was tried by a jury beginning later that same month and found guilty of second degree arson. On March 31, 1971, he was sentenced to five years, the sentence to run concurrently with a ten-year sentence imposed by Judge Hepp for a narcotics offense.

Tarnef alleged a variety of errors in the process which led to his conviction. These are set out and discussed separately because no satisfactory method of continuity is available to discuss such unrelated topics. Tarnef's allegations of error are as follows:

1. AS 11.20.020, under which he was convicted, is an unconstitutional exercise of police power to the extent it makes innocent behavior criminal.

2. He was denied due process of law as guaranteed by the fourteenth amendment to the United States Constitution because of the pretrial delay.

3. He was denied his right to speedy trial as guaranteed by the sixth amendment of the United States Constitution and made applicable to the states by the fourteenth amendment and as guaranteed by article I, section 11, of the Alaska Constitution.

4. His statement, a product of custodial interrogation, was taken in violation of Miranda v. Arizona[1] since there was no showing of effective waiver of his fifth and sixth amendment rights under the United States Constitution.

5. His statement was given in exchange for promises of leniency and was therefore involuntary and should have been excluded.

I

AS 11.20.020 provides:

*Second degree arson.* A person who wilfully and maliciously sets fire to or burns or causes to be burned, or who aids, counsels or procures the burning of a building or structure of any kind, whether his property or the property of another, not included or described in § 10 of this chapter [arson of a dwelling], is guilty of arson in the second degree, and upon conviction is punishable by imprisonment for not less than one nor more than 10 years, or by a fine of not more than $5,000, or by both.

Relying on the "last antecedent" rule of statutory construction,[2] appellant argues that the phrase "wilfully and maliciously" refers only to " [a] person who . . . . sets fire to or burns or causes to be burned . . . " and does not modify "who aids, counsels or procures the burning of a building or structure . . . . " Consequently, a person can be convicted of second degree arson under the statute if he "aids, counsels or procures the burning of a building" even though he is not shown to have had any specific criminal intent. Appellant argues that the absence of a criminal intent requirement makes the statute violative of the due process clause as an unreasonable exercise of police power.

The threshold issue, however, is whether we should consider this issue on appeal since, as the State points out, the alleged constitutional error was not raised at trial[3] and was not included in appellant's statement of points on appeal as required by Supreme Court Rule 9(e).[4] In Harris v.

1. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. *See* Sutherland, Statutory Construction § 4921 (3d ed. 1943).

3. It is unclear whether a constitutional defect in the statute upon which the indictment is based is one of the "defects

in the institution of the prosecution" within the meaning of Criminal Rule 12 (b) (2) which must be raised by motion before trial or deemed waived.

4. The Supreme Court Rules were recently repromulgated as the Appellate Rules. Since the Supreme Court Rules were in

State, 457 P.2d 638 (Alaska 1969), however, this court examined appellant's claim that the statute under which he was indicted was unconstitutional in spite of the failure of appellant to object to the indictment. The court stated:

[I]f the statute under which appellant was indicted is unconstitutional, it follows that the indictment and judgment of conviction would be vitiated and we should reverse under the plain error rule. (Footnote omitted.) *Id.* at 640.

 Similarly, if the statute under which Tarnef was charged is unconstitutional, the resulting indictment and conviction would constitute plain error under Alaska Criminal Rule 47(b).[5] Accordingly, we shall consider the issue although it was not brought to the attention of the trial court. Upon turning to the merits of this argument, we find that while appellant's construction of the statute makes grammatical sense, it is a tortured reading of the statute. The legislature's probable intent can be inferred by reading AS 11.20.020, the arson statute, together with AS 12.15.010. AS 12.15.010 provides:

*Abrogation of distinctions between accessories and principals.* The distinction between an accessory before the fact and a principal, and between principals in the first and second degree is abrogated; and all persons concerned in the commission of a crime, whether they directly commit the act constituting the crime or, though not present, *aid and abet in its commission,* shall be prosecuted, tried, and punished as principals. (Emphasis added.)[6]

The most sensible way to construe the second degree arson statute is that the legislature used the words "aids, counsels or procures" as synonymous with "aid and abet". Since AS 11.20.020 prescribes the same punishment for the perpetrator and the person who "aids, counsels or procures" the burning, this reading is consistent with AS 12.15.010.

This does not appear to be a strained reading of the statutory language. It can be inferred that the words "aid and abet" are used synonymously with various combinations of the words assist, advise, counsel, procure, encourage, incite and instigate. Similarly, in Thomas v. State, 391 P.2d 18 (Alaska 1964), this court approved a jury instruction which read in part:

" 'Aid and abet' means to help, assist, or facilitate the commission of a crime, promote the accomplishment thereof, help in advancing or bringing it about, or encourage, counsel, or incite as to its commission." *Id.* at 25.

 If it is conceded that "aid, counsel or procures" means "aid and abet" then appellant's argument that the "lack of any requirement of specific intent or malice . . . makes the statute unconstitutional as an unreasonable exercise of police power" evaporates. It is well established at common law and in Alaska that a person cannot be convicted of "aiding and abetting" a crime unless it is shown that he had the specific criminal intent to bring about the illegal end. Thus, in Mahle v. State, 371 P.2d 21 (Alaska 1962), this court stated:

An accomplice is generally defined as one who in some manner, *knowingly and*

effect at the time the appeal was taken, they are referred to here.
Alaska Supreme Court Rule 9(e) provides in part:

The appellant shall serve and file with his designation a concise statement of the points on which he intends to rely on the appeal. The court will consider nothing but the points so stated.
. . .

*But see* Judd v. State, 482 P.2d 273, 280 (Alaska 1971).

5. Criminal Rule 47(b), specifies:
 *Plain Error.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

6. *But see* AS 11.10.010 which classifies parties to crime as "principals" and "accessories". The word "accessories" in that statute, however, refers only to "accessories after the fact"—persons who aid or conceal a felon *after* he has committed the crime. AS 12.15.020.

*with criminal intent* aids, abets, assists or participates in a criminal act. (Footnote omitted, emphasis added.) *Id.* at 25.

Also in Fajeriak v. State, 439 P.2d 783 (Alaska 1968), cert. denied, 393 U.S. 881, 89 S.Ct. 184, 21 L.Ed.2d 155 (1968), the court citing *Mahle* stated:

There is no evidence in the record from which it could be inferred that Benton and Gamradt had in any manner, *knowingly and with criminal intent,* aided, abetted, assisted or participated with Fajeriak in committing the murder. The trial judge was therefore correct in determining as a matter of law that they were not accomplices. (Footnote omitted, emphasis added.) *Id.* at 789.

■ *Mens rea* requirements clearly have a basic place in our system of criminal law. In Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), the Supreme Court stated:

The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. (Footnote omitted.) *Id.* at 250, 72 S.Ct. at 243, 96 L.Ed. at 293.

In Speidel v. State, 460 P.2d 77 (Alaska 1969), this court noted that except for certain "public welfare" offenses the general rule is that criminal liability could not be imposed absent a showing of criminal intent. Citing *Morissette* the court made the

following statement which would seem dispositive here:

It is true that one will sometimes find felony statutes that are silent on the subject of criminal intent. But these are instances where the states have codified the common law of crimes, and their courts have assumed that the omission of the requirement of criminal intent did not signify disapproval of the principle but merely recognized that intent was so inherent in the idea of the offense that it needed no statutory affirmation. Thus, as to felony-type offenses codified from the common law, the courts have found an implication of intent. Representative of these instances are larceny-type offenses where the state courts have consistently retained a requirement of criminal intent. (Footnotes omitted.) *Speidel* at 79.

That is precisely the situation we face here. It is clear that at common law criminal intent was a necessary element of liability as an aider and abettor.[7] Although Alaska now treats aiders and abettors as principals, the common law intent requirement remains.[8] Accordingly, we hold that although intent is not specifically mentioned in the portion of the second degree arson statute which refers to one who "aids, counsels or procures the burning of a building", criminal intent is required as a necessary element of the crime.

■ Finally, it should be emphasized that the judge correctly instructed the jury that it could not find Tarnef guilty under the arson statute unless it found he possessed the requisite criminal intent.[9]

7. *E. g.,* Peats v. State, 213 Ind. 560, 12 N.E.2d 270, 277 (Ind.1938).

8. *See* Fajeriak v. State, 439 P.2d 783, 789 (Alaska 1968) ; Mahle v. State, 371 P.2d 21, 25 (Alaska 1962).

A number of other jurisdictions have similarly read intent requirements into criminal statutes that were silent as to *mens rea.* *See* State v. Krug, 96 Ariz. 225, 393 P.2d 916, 918 (1964) ; State v. Hennings, 3 Wash.App. 483, 475 P.2d 926, 930–931 (1970).

9. Instruction No. 3 stated:

The law applicable to the crime of arson in the second degree, as charged in the Indictment in this case is as follows:

"A person who wilfully and maliciously sets fire to or burns or causes to be burned, or who aids, counsels or procures the burning of a building or structure of any kind . . . . . . is guilty of arson in the second degree."

The material allegations and essential elements of the crime of arson in the

## II

Appellant next argues that he was denied due process of law and deprived of his right to speedy trial because of the delay prior to trial. The fire at the White Swan occurred on April 25, 1969; Tarnef's trial began on February 24, 1971.

There is considerable confusion and disagreement as to whether Tarnef made a motion at trial to dismiss for the alleged due process and speedy trial violation. In his statement of points on appeal appellant stated: "6. The court erred in failing to grant appellant's motion to dismiss for the reason that he was denied a speedy trial." There is no indication in the record or the transcript, however, that appellant made such a motion at or prior to trial. In his brief appellant urges in the abstract that speedy trial and due process violations occurred but makes no references to any motions filed below. Moreover, in his reply brief, appellant failed to respond to the State's argument that his speedy trial and due process arguments should not be considered on appeal.

In Judd v. State, 482 P.2d 273, 280 (Alaska 1971), this court refused to entertain appellant's speedy trial contention and noted that he did not raise this point at trial. The court was also influenced in its refusal by the fact that the speedy trial issue was not mentioned in the points on appeal and was inadequately briefed. Since appellant here did brief the issue and list it in his points on appeal, however, *Judd* would not seem to preclude consideration of his argument. Further, in a number of other cases, this court citing the plain error rule, Criminal Rule 47(b), stated that it would consider errors involving deprivation of fundamental rights of appellant for the first time on appeal.[10] Since this trial occurred after Glasgow v. State, 469 P.2d 682 (Alaska 1970), was decided, and the total delay from offense to trial exceeded 20 months, the spectre of plain error is

second degree, each of which the State must prove beyond a reasonable doubt before you may find the defendant guilty of the crime of arson in the second degree are:

1. That on or about the 25th day of April, 1969, at Fairbanks, in the Fourth Judicial District, State of Alaska, Michael Allen Tarnef did aid, counsel or procure the burning of a building, to-wit: the White Swan Laundry, property of Alvin Martin.

2. That said act was done wilfully and maliciously.

3. That there was an actual fire or burning.

Instruction No. 4 stated:

The term "wilfully" means that the defendant knew what he was doing and voluntarily decided to do it without regard for the law or the rights of others.

The term "unlawfully", as used in these instructions means contrary to law.

The term "feloniously" means with criminal intent and evil purpose.

Malice exists when a defendant intentionally does an unlawful act without justification or other legal excuse. Ill will or hostility is not required. The existence of malice may be determined from the manner in which an act is

done, the means used, and from all the facts and circumstances in the evidence.

Instruction No. 6 stated:

Under the laws of Alaska a person need not directly commit each act constituting the offense charged to be guilty thereof. A person who aids and abets in the commission of a crime through a joint design and purpose is as guilty as the person or persons who commit the offense personally.

In order to aid and abet another to commit a crime it is necessary that the defendant wilfully associate himself in some way with the criminal venture; and that he wilfully participate in it as something he wishes to bring about; and that he wilfully seek by some action of his to make it succeed.

Thus it is not incumbent upon the State to prove beyond a reasonable doubt that this defendant committed every element of the crime alleged to sustain a conviction. It is sufficient to sustain a conviction if you believe beyond a reasonable doubt that the offense was committed and that the defendant aided and abetted in its commission.

10. *See* Hammonds v. State, 442 P.2d 39, 43 (Alaska 1968); Kugzruk v. State, 436 P.2d 962, 963 (Alaska 1968); Goresen v. State, 432 P.2d 326, 327 (Alaska 1967).

clearly presented.[11] If Tarnef is correct, plain error was committed, and we therefore consider the issue.

The presentation of the arguments on the merits was also murky. The parties disagree both as to when the State had sufficient evidence to indict Tarnef and as to the reasons for the delay between indictment and trial. Appellant points out that Hagar testified that Tarnef implicated himself in June 1969, when he talked to Hagar and Martin. Martin related the circumstances of this conversation to the police that same day, and appellant argues that since the police then had sufficient information to support an indictment, the delay should be measured from that point in time. An interval of 20 months elapsed between that date and the time of trial, February 1971—the interval between Tarnef's June conversation with Martin and Hagar and the indictment and trial.

The State, on the other hand, points to the testimony of Martin and Tarnef which indicates that Tarnef did not implicate himself at the June 1969 meeting with Hagar and Martin. It argues that the State did not have sufficient evidence to indict Tarnef until it receives a copy of Tarnef's statement to Timlin in February 1970. Tarnef was indicted two months later on April 30, 1970.

The latest case to discuss the question of speedy trial in precharge situations, Marks v. State, 496 P.2d 66, 68 (Alaska 1972), does not decide whether Alaska follows the holding of United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), that the sixth amendment right to speedy trial attaches only after arrest of a

defendant or the institution of public criminal charges against him.[12] It does contain a discussion regarding the protection against precharge delay afforded by the due process clause, concluding that "both the absence of a valid reason for preaccusation delay and the fact of prejudice must be established in order to support a due process claim."

In one of the few cases holding that preindictment delay constitutes a violation of the sixth amendment, Judge von der Heydt quoted with approval from Justice Brennan's concurring opinion in Dickey v. Florida,[13] establishing the following test:

> Thus, it may be that for the purposes of the (Speedy Trial) [C]lause to be fully realized, it must apply to any delay in the criminal process that occurs after the government decides to prosecute and has sufficient evidence for arrest or indictment.[14]

The preindictment delay in the Tarnef case not only did not occur after the government had decided to prosecute, but additionally there was every valid reason for the State not to initiate prosecution until after the subsequent statement. While it may be debatable as to whether the initial statement made by Tarnef was adequate for the purpose of obtaining an indictment, it is not suggested and cannot seriously be concluded that it was unreasonable for the State to refrain from launching a prosecution, utilizing such a fragile vessel. We find that under the facts of this case the delay was reasonable.

Thus, regardless of the test applied (i.e., under the due process clause as set forth in

11. At oral argument the State indicated that they also were under the impression that such a motion had been filed and that it had been filed in one of the other cases involving the same defendant.

12. In McKay v. State, 489 P.2d 145, 150 n. 6 (Alaska 1971), we also failed to reach the issue of whether preindictment delay violated the sixth amendment right to a speedy trial.

13. 398 U.S. 30, 46, 90 S.Ct. 1564, 1573, 26 L.Ed.2d 26, 37 (1970).

14. United States v. Wahrer, 319 F.Supp. 585, 587 (D.Alaska 1970), cited in United States v. Marion, 404 U.S. 307, 317, 92 S.Ct. 455, 461, 30 L.Ed.2d 468, 477 n. 8, as one of three district court cases wherein " 'delay' for Sixth Amendment purposes [have been] computed from the time of the crime or from the time when the government considers the defendant's actions criminal". As indicated above, the Marion holding is contrary.

*Marks* or under the sixth amendment as suggested in *Wahrer*), it is clear that this case does not present facts to justify our holding that the preindictment delay constituted a violation of Tarnef's constitutional rights, requiring reversal. Accordingly, we again do not reach the question of whether a preindictment delay violates the speedy trial provisions of the sixth amendment to the United States Constitution or the analogous provisions of article I, section 11, of the Alaska Constitution.

■ Regarding the postindictment delay, appellant argues that Tarnef, by his attorney's stipulation, consented to only two weeks of the ten-month delay. The State, however, points out that appellant filed a series of motions prior to trial and attributes approximately one-half of the postindictment delay to appellant.

A brief chronology follows: Tarnef was indicted on April 30, 1970. On May 6, Tarnef moved for a transcript of the grand jury minutes. The court took the motion under advisement on May 21 and entered an order on June 4 denying the motion. On June 22 Tarnef, acting pro se, filed a notice of appeal to the Supreme Court accompanied by an affidavit and on July 29 filed a statement of points on appeal and designation of record. This court, treating Tarnef's motion as a petition for review, entered an order denying his motion on August 31. On September 30 Tarnef filed an affidavit in an attempt to disqualify Judges Hepp and Taylor, and a motion to have access to the legal library. On October 28 Tarnef filed a pauper's affidavit and Millard Ingraham was appointed to represent him. On November 13 Tarnef plead not guilty to the charges. On November 18 Tarnef filed a motion for a suppression hearing; the State filed an opposition on December 2, and on December 3 the court denied the motion apparently because Timlin was not then in Fairbanks. The court denied Tarnef's motion for access to the library on January 14.

Trial was scheduled for February 1, but on January 29 Tarnef's counsel stipulated that trial be postponed until February 16. On February 18 Tarnef moved to disqualify Judges Hepp, Taylor and VanHoomissen. On February 19 the suppression hearing began. Judge Hepp denied the motion to disqualify himself and ruled that Tarnef's statement was admissible. The trial itself began on February 24 and was completed March 2.

In addition, Tarnef had five other charges pending against him at various stages during the period of time after the White Swan fire. The charges were: (1) sale of heroin-indicted July 24, 1969, tried and found guilty March 9, 1970; (2) robbery—indicted February 19, 1969, found not guilty on December 4, 1969 after a first trial resulted in a hung jury; (3) larceny (federal charge)—indicted June 1968, found not guilty on September 9, 1970; (4) robbery—indicted December 1969; first trial resulted in hung jury in November 1970, charges dismissed in December 1970; (5) larceny—indicted December 1968, charges dismissed June 1969.

In Tarnef v. State, 492 P.2d 109 (Alaska 1971) and Nickerson v. State, 492 P.2d 118 (Alaska 1971), this court built on the teaching of Glasgow v. State, 469 P.2d 682 (Alaska 1970), and Rutherford v. State, 486 P.2d 946 (Alaska 1971), and held that in determining whether a speedy trial violation had occurred the court would consider three factors—the source of the delay, the reasons for the delay, and whether the delay prejudiced interests protected by the speedy trial guarantee.[15] These protected interests spring from the three main purposes of the speedy trial guarantee: (1) to prevent the weakening of defendant's case as evidence disappears and witnesses' memories fade; (2) to prevent prolonged pretrial incarceration; and (3) to limit the infliction of anxiety upon the accused.[16] In *Glasgow, Rutherford* and State v. Mardock, 490 P.2d 1223 (Alaska 1971), the

15. Tarnef v. State, 492 P.2d 109, 112 (Alaska 1971).

16. Nickerson v. State, 492 P.2d 118, 119 (Alaska 1971).

court attached a presumption of prejudice to these three protected interests for delays in excess of fourteen months; in *Tarnef* and *Nickerson*, however, where the delay involved was about eight months the court stated it would require a showing of actual prejudice.

In the case at bar the interval between indictment and trial was about 10 months. At least a portion of the delay, however, must be attributed to Tarnef. In calculating the delay attributable to the State, the new speedy trial rule, Criminal Rule 45, excludes periods of delay resulting from other proceedings concerning the defendant such as motions to suppress evidence, from trials on other charges, from interlocutory appeals and from any continuance consented to by defendant's attorney. Using the new rule as a guide,[17] the following periods should be excluded: the May 5—August 31 interval Tarnef sought by motion and appeal to obtain a transcript of the grand jury proceedings; the two-week trial postponement stipulated to by his counsel; the few days it took to hold the suppression hearing; and the period Tarnef was on trial for the federal larceny and state robbery charges. (It is unclear from the record precisely how much time was involved in trying these charges.) Therefore, something less than six months of the delay is attributable to the State; since this is less than the delay involved in *Tarnef* and *Nickerson*, appellant must show actual prejudice in order to prevail.

This appellant fails to do. Tarnef was tried for possession and sale of heroin on March 9, 1970, found guilty and sentenced to 10 years imprisonment. The grand jury returned the arson indictment on April 30, 1970. Since Tarnef had already been sentenced and imprisoned for the heroin con-

viction, his postindictment incarceration cannot be said to have prejudiced his interest against pretrial imprisonment. Nor does Tarnef make any showing of prejudice to his ability to defend himself; there is no allegation in his brief that any defense witness' memory had dimmed or that Tarnef was unable to locate a defense witness. In short, there was no showing that the fact-finding process at trial was impaired or the integrity of the judgment of conviction in any way affected.[18] Regarding the pretrial anxiety suffered by *Tarnef* the following statement of the court in *Nickerson* is relevant:

> It would be an exceptional case where such anxiety, standing alone, would constitutionally necessitate dismissal of a criminal prosecution. Some anxiety always results from criminal indictment; only through speedy resolution of criminal cases can such anxiety be minimized. However, appellant has not alleged, nor do we find anything in the record on appeal which would indicate, that he suffered any greater anxiety than that which normally flows from a criminal charge. 492 P.2d at 121.

Moreover, the incremental anxiety imposed by this charge, the sixth in three years, was probably minimal. Tarnef has failed to establish the necessary facts to prevail on his speedy trial argument.

### III

Appellant also argues that it was error to deny the motion to suppress the statement given to Timlin. Tarnef contends that he did not receive a valid *Miranda*[19] warning and, therefore, the statement was clearly involuntary for he did not waive his fifth amendment rights under the United States Constitution.[20]

---

17. Although the new rule does not apply directly, it is a reliable index of the kinds of delay which this court will not attribute to the State. Criminal Rule 45 (d) specifies the excluded periods.

18. *See* Tarnef v. State, 492 P.2d 109, 113 (Alaska 1971); Nickerson v. State, 492 P.2d 118, 121 (Alaska 1971).

19. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

20. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), makes the fifth amendment of the United States Constitution applicable to the states.

A preliminary problem is raised by the question of whether or not Timlin as a private investigator was required to give a *Miranda* warning to appellant before discussing the case with him. Unquestionably, the requirements set forth in *Miranda* and *Escobedo* [21] were directed toward policemen and not private citizens. They were intended to insure the reliability of confessions of people while in police custody and to guard against officials overreaching to obtain confessions.

In this case, Timlin was working closely with the police as an arson investigator. He had promised to turn over any statement he obtained to the police and had, in fact, enlisted the aid of the police and the district attorney's office to obtain access to the appellant who was incarcerated in the Fairbanks Regional Correction Center. After obtaining the statement the police drove appellant and Timlin around the city to confirm the accuracy of the statement. Timlin, himself, recognized his position as basically part of the official team, for he testified he thought he had to give the *Miranda* warning both because of his background as a former law enforcement officer and the nature of his position. In fact, he testified he did give such a warning to appellant in this case.

■ Therefore, we hold under the facts of this case that Timlin was required to give a *Miranda* warning and secure the defendant's waiver of rights before undertaking interrogation of appellant.[22]

While there is substantial testimony from Timlin and Hagar that they advised appellant of his rights before taking the statement, this is denied by appellant. The trial court did not resolve this conflict in the testimony, stating:

> I don't know whether to believe Timlin. He says that he even—that they did discuss rights in this matter that anything you could say would be used against you and all that sort of stuff and said that if the defendant—the defendant rejected this. He says, 'If you're gonna start talking like that, I don't want any part of it,' or words of that import all the more shows that there—nobody was kidding anybody there, nobody was under any mistaken belief as to what was going on.

While it is abundantly clear from the record that the court and counsel were discussing problems raised by *Miranda* and the procedural requirements for admission of confessions set forth in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the record is silent concerning the ruling of the trial court on the question of whether the court found the *Miranda* warning had been given.

If we were confronted solely with the question of whether the warning had been given it might be possible to remand the case for such a determination. *Miranda,* however, in addition to requiring a warning, specifies:

> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant *knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel* . . . . This Court has always set high standards of proof

21. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

22. The question of whether or not private persons, private security officers, private police or private detectives are within the prohibitions of *Miranda* may very well depend upon the facts of a given case. *Cf.* People v. Polk, 63 Cal.2d 443, 47 Cal. Rptr. 1, 406 P.2d 641, 645 (1965) and People v. Price, 63 Cal.2d 370, 46 Cal.

Rptr. 775, 406 P.2d 55, 61 (1965). *See also* People v. Wright, 249 Cal.App.2d 642, 57 Cal.Rptr. 781, 782 (1967); People v. Crabtree, 239 Cal.App.2d 789, 49 Cal.Rptr. 285 (1965); Annot., 31 A.L.R.3d 565, 647–74 (1970); Comment, Seizure by Private Parties: Exclusion in Criminal Cases, 19 Stan.L.Rev. 608 (1967).

for the waiver of constitutional rights, . . . and we reassert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. *But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.* A statement we made in Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70, 77 (1962), is applicable here:

> "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver."

Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724 (1966). (Citations omitted, emphasis added.)

 The facts in this case, far from indicating a knowing waiver by Tarnef of his privilege against self-incrimination, reveal an expressed refusal to waive that privilege. Even when viewing Timlin's testimony it appears that after the warning was given, Tarnef said " 'hold' or 'whoa' or something like that, 'that kind of talk scares me' or 'bothers me'." Thus, rather than showing that Tarnef expressly waived his rights, it indicates that he refused to give a statement if it were to be regarded as a waiver of those rights.

The absence of an intelligent waiver is further indicated by the fact that Timlin did not conclude the written statement which he had Tarnef sign with the now classical *Miranda* warning and a statement that Tarnef knowingly waived his rights thereunder. The statement concluded as follows:

> I have read all of the five pages of this statement and it is a true statement to the best of my knowledge, given by me to R. T. Timlin, without having received any threats or promises.

Considering Timlin's well evidenced knowledge of the *Miranda* requirements, the logical inference is that he did not set forth the warning and waiver for the reason that he knew that Tarnef would not sign a statement containing any such waiver.

In a closely analogous situation, the United States Court of Appeals for the Seventh Circuit held in United States ex rel. Williams v. Twomey[23] that there was no effective waiver of *Miranda* rights after the defendant had been read the warning but refused to sign a waiver form. Thereafter the accused did answer questions producing incriminating information. The court held:

> The record here is totally barren of evidence of a knowing and intelligent waiver. There is no evidence to support an inference that the statements were spontaneous or volunteered. We accordingly hold that the October 15 and October 20 Indiana statements were inadmissible . . . for failure of proof of a knowing and intelligent waiver.

To summarize, the State has failed to meet the "heavy burden [which] rests on the government to demonstrate [waiver]". *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.[24] Accordingly, at any

---

23. 467 F.2d 1248, 1251 (7th Cir. 1972).

24. While extensive argument was made in the court below to the effect that the confession was involuntary and that a *Miranda* warning had not been given, counsel did not expressly ground his objection on the absence of a waiver by Tarnef. Nor was this facet of the *Miranda* ruling raised specifically on the appeal to this court. We reach the issue,

retrial the confession of February 13, 1970 and any fruits, thereof, may not be utilized. Since the confession is inadmissible we do not reach the question of whether it was otherwise involuntary because it was allegedly given in exchange for promises of immunity and leniency.

Reversed and remanded.

FITZGERALD, J., not participating.

ERWIN, Justice (dissenting).

I dissent. I believe the admissibility of Tarnef's statement depends upon the outcome of a hearing that should be held to decide first, if Tarnef received his *Miranda* warnings, and second, if so, was there a valid waiver.

The statement in question was made by Tarnef to fire investigator Timlin at the Northern Regional Correction Center. Tarnef requested this conference. Timlin took down a five page statement in longhand from notes and conversation with Tarnef at the correctional center. Tarnef signed each page of the statement.

The record does clearly demonstrate (as the majority candidly admits) [1] a direct conflict in testimony concerning whether and *Miranda* warnings were in fact given. Since the trial court did not rule on this conflict of testimony as required by law, the admission of the statement was error.[2] However, this court is not in a position to resolve either the competing inferences or the direct factual conflict without the benefit of a decision on the issue by the trial court. Credibility is the necessary ingredient to resolve the conflict, yet we have never seen any of the witnesses nor observed their demeanor. Certainly such things as age, intelligence, education and prior criminal experience are as equally important in judging what the witnesses say as the words themselves.[3] The same words can often mean different things depending upon the circumstances under which they are spoken. Thus, the hearing should first determine whether Tarnef was given the proper *Miranda* warnings.

I depart from the majority opinion because as a matter of law I cannot say there are no facts which would have permitted the trial court to hold that there was a valid waiver by Tarnef of his *Miranda* rights. I am aware that the Supreme Court in Miranda v. Arizona[4] stated:

> An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.

However, I feel the necessary plus element could be found on rehearing: that there may be more than simply a warning followed by a statement.

The majority upon finding no classical waiver of Tarnef's *Miranda* rights at the end of his written statement saw this as evidence of the absence of an intelligent and knowing waiver. However, it appears

however, on either the basis that the reference to *Miranda* in the court below sufficiently alerted the trial court to the question involved or, in the alternative, that in the absence of a showing that Tarnef knowingly waived his privilege against self-incrimination, admission of the statement constituted plain error. Alaska Criminal Rule 47(b) ; Drahosh v. State, 442 P.2d 44 (Alaska 1968) ; Noffke v. State, 422 P.2d 102 (Alaska 1967). In Hammonds v. State, 442 P.2d 39 (Alaska 1968), when it was apparent to the court that a defect in a *Miranda* warning was knowingly waived by counsel, as a

trial strategy, we held that the defect could not be regarded as plain error.

1. Hagar and Timlin say the warning was given and Tarnef denies that any warning was given.

2. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ; Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

3. *Cf.* Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242, 249 (1960).

4. *Supra*, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.

to me that the last paragraph referred to in the majority opinion can as logically be inferred to support the opposite view. The paragraph states:

> I have read all of the five pages of this statement and it is a true statement to the best of my knowledge, given by me to [K. J.] Timlin, without having received any threats or promises.

It is interesting to note that Tarnef accompanied Timlin and Hagar in a police car the day after making the statement to point out the places where the various events took place. Previous to the statement Hagar and Timlin had visited Tarnef on at least four previous occasions over a six month period. Perhaps the most telling single piece of evidence is that at Tarnef's request certain information was omitted from the statement. Taking these facts together I cannot say that the trial court on rehearing would be precluded from holding that Tarnef made a knowing and intelligent waiver of his *Miranda* rights.

The record on the issue of waiver is susceptible to conflicting inferences because of the focus of the legal arguments of Tarnef in the trial court. The primary emphasis was placed on the inadmissibility of the confession because of a promised immunity from prosecution, with a secondary argument based on a failure to give any *Miranda* warning. Nowhere does there appear the argument by Tarnef that he did not voluntarily waive his rights assuming arguendo that a *Miranda* warning had been given. Accordingly, there are few direct facts upon which to resolve such an issue.

Appellant is clearly entitled to a full hearing and decision on these issues in the trial court. If at the conclusion of such an evidentiary hearing it is determined that the required warning was given and that appellant waived his rights thereunder, the confession was admissible in evidence and properly considered by the jury. There would be no constitutional reason for proceeding with a new trial[5] as appellant has already been tried by a jury which considered the confession and was found guilty. It would be fair to assume under the facts of this case that the conviction rested at least in part on the statement. This is acceptable so long as[6] the confession is now found to be admissible.[7]

If, however, the trial court finds that the necessary *Miranda* warnings were not given, or that appellant did not waive his rights, the trial court must order a new trial where Tarnef's statement would not be admissible.

I would remand this case for a limited hearing on the *Miranda* issues.

---

5. Swenson v. Stidham, 409 U.S. 224, 93 S.Ct. 359, 34 L.Ed.2d 431, 436 (1972); Jackson v. Denno, *supra*, 378 U.S. at 394, 84 S.Ct. at 1790, 12 L.Ed.2d at 926.

6. 409 U.S. at 228, 93 S.Ct. at 362, 34 L.Ed. 2d at 436.

7. We should not assume that the trial court will not now give appellant a hearing inconsistent with the requirements of the constitution.