NOTICE

*The text of this opinion can be corrected before the opinion is published in the* Pacific Reporter. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| AMY DAWN GIBSON, | Court of Appeals No. A-11094 |
| Appellant, | Trial Court No. 3AN-10-4238 CR |
| v. | O P I N I O N |
| STATE OF ALASKA, | |
| Appellee. | No. 2448 — April 3, 2015 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Beverly Cutler, Judge.

Appearances: Marjorie Mock, under contract with the Public Defender Agency, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Hanley, District Court Judge.[*]

Judge HANLEY, writing for the Court.
Judge MANNHEIMER, concurring.

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

On March 28, 2010, a man went into a coffee shop in downtown Anchorage and, while the owner's back was turned, stole a charity donation jar from the counter. Taking the jar, the man quickly left the shop and got into the back seat of a waiting vehicle.

The owner immediately noticed the theft, and she and her daughter ran out of the shop in pursuit of the thief. They went up to the waiting vehicle, and they told the driver — Amy Dawn Gibson — not to leave. Instead, Gibson drove away. The owner and her daughter held onto the car for a short distance, but ultimately they both fell to the ground, sustaining minor injuries.

Based on this episode, Gibson was convicted of second-degree robbery under the theory that she was an accomplice to the theft of the donation jar from the immediate presence and control of the coffee shop owner, and that, by driving away while the owner and her daughter were holding onto the car, Gibson used force "to prevent or overcome resistance to the taking ... or retention" of the stolen property.[1]

Gibson was also convicted of two counts of third-degree assault under the theory that Gibson recklessly caused physical injury to the owner and to her daughter by means of a dangerous instrument (*i.e.*, the vehicle).[2]

In this appeal, Gibson challenges all three of these convictions.

With respect to her robbery conviction, Gibson contends her conduct did not constitute second-degree robbery because (1) the taking of the donation jar was essentially complete by the time she used force against the owner and her daughter, and (2) the second-degree robbery statute does not apply to situations where force is used

---

[1] AS 11.41.510(a)(1).

[2] AS 11.41.220(a)(1)(B).

*after* a theft has been committed, while the thief is in immediate flight from the scene of the crime. She also challenges the sufficiency of the evidence of her robbery conviction.

And with respect to her two third-degree assault convictions, Gibson argues that she did not use her vehicle in such a manner that it qualified as a "dangerous instrument." Gibson thus contends that even if she recklessly caused injury to the coffee shop owner and her daughter, this would only constitute fourth-degree assault, not third-degree assault.

For the reasons explained in this opinion, we reject Gibson's contentions, and we affirm her convictions.

We now address Gibson's arguments in reverse order.


*Gibson's argument that, under the facts of this case, the motor vehicle did not constitute a "dangerous instrument"*

Alaska Statute 11.81.900(b)(15)(A) defines "dangerous instrument" as including "anything that, under the circumstances ... , ... is capable of causing death or serious physical injury." Gibson asserts that, even viewing the evidence in the light most favorable to the jury's verdict, she did not use the vehicle in such a manner that it was capable of causing death or serious physical injury.

More particularly, Gibson argues that she drove away from the coffee shop in an "unremarkable manner" — not at a high speed, nor recklessly. Noting that the owner and her daughter suffered only minor injuries, Gibson argues that there was "no readily identifiable, actual risk" of serious physical injury.

As we have pointed out in previous cases, a motor vehicle can qualify as a "dangerous instrument" when it is used in a manner that creates a real *danger* of serious physical injury, even though no one suffers serious injury.

For example, in *State v. Waskey*, the defendant was driving an automobile when she struck a child who was riding a bicycle.[3] The handlebar of the bicycle hooked onto the front bumper of the car, and Waskey dragged the child 140 feet before stopping. Fortunately, the child was not seriously injured.[4]

We concluded that, under these circumstances, Waskey's automobile constituted a dangerous instrument:

> Because of an automobile's solidity and mass, an automobile is normally easily capable of inflicting death or serious physical injury in such circumstances. While it is possible to imagine collisions between an automobile and a pedestrian or a cyclist that one might not expect to result in serious physical injury (for instance, when the driver's failure to set the parking brake leads to a collision at 2 miles per hour), these are clearly exceptional cases.

> Under any reasonable construction of the facts of Waskey's case, her automobile constituted a "dangerous instrument" within the statutory definition. The circumstances of Waskey's collision with the bicyclist show that her car was easily capable of inflicting serious physical injury or death; indeed, the bicyclist's escape with only minor injuries was completely fortuitous.[5]

In the present case, Gibson drove away from the coffee shop while both the owner and her daughter were holding onto the car. The owner took several big steps to keep up with the car, and then she fell into the oncoming lane of traffic and struck her head on the roadway. The owner's daughter had to lift her feet to avoid being run over. She eventually let go of the car and fell to the roadway, where she rolled to a stop. Her

---

[3]   *State v. Waskey*, 834 P.2d 1251, 1252 (Alaska App. 1992).

[4]   *Id*. at 1252.

[5]   *Id*. at 1253.

clothing was ripped, she lost her shoes in this fall, and her shoulders and side were bleeding.

The question is whether this evidence, viewed in the light most favorable to the jury's verdict, was sufficient to allow fair-minded jurors to reasonably conclude that Gibson used the vehicle in such a manner that it was "capable of causing death or serious physical injury."[6] We conclude that the answer is "yes."

The evidence presented at Gibson's trial was therefore legally sufficient to support Gibson's convictions for third-degree assault.

*Gibson's argument that her conduct did not fall within the definition of second-degree robbery*

Under the provisions of AS 11.41.510(a)(1), a defendant commits second-degree robbery if, "in the course of taking ... property from the immediate presence and control of another," the defendant uses force (or threatens the immediate use of force) "with intent to ... prevent or overcome resistance to the taking of the property or the retention of the property after taking."

Viewing the evidence in the light most favorable to the jury's verdict, (1) Gibson was criminally liable as an accomplice of the man who stole the donation jar, and (2) she used force against the coffee shop owner and her daughter for the purpose of preventing or overcoming resistance to the man's retention of the donation jar.

Gibson argues that by the time she used force against the owner and her daughter, the jar had already been successfully "tak[en] ... from the immediate presence and control" of the owner. Thus, Gibson claims, her use of force did not occur "in the course of" this unlawful taking. Rather, her use of force occurred *after* the taking —

---

[6]    *Abyo v. State*, 166 P.3d 55, 60 (Alaska App. 2007).

while her accomplice (the man who took the jar) was "in immediate flight" from this act of theft.

The wording of the definition of robbery (*i.e.*, the definition of the offense found in the second-degree robbery statute) seemingly refutes Gibson's argument. Under this definition, the crime of robbery occurs not only when a person uses force to prevent or overcome resistance to "the taking of the property," but also when a person uses force to prevent or overcome resistance to "the retention of the property after taking."[7]

Thus, it appears that the drafters of this statute intended the definition of robbery to cover instances where a thief uses force to retain possession of stolen property during the immediate flight from the scene. But Gibson argues that a provision of the *first-degree* robbery statute shows that this interpretation of the second-degree statute is incorrect.

Gibson notes that, under the definition of first-degree robbery codified in AS 11.41.500(a), second-degree robbery is raised to robbery in the first degree if the defendant uses a dangerous instrument, or threatens to use a dangerous instrument, (1) "in the course of" committing second-degree robbery, *or* (2) "in immediate flight thereafter."

Gibson argues that there would be no need for the legislature to include this second clause — the clause referring to "immediate flight thereafter" — if the crime of second-degree robbery already included a defendant's immediate flight from the scene. Thus, Gibson argues, an act of violence that occurs during a defendant's "immediate flight" from the unlawful taking of property does not, as a matter of law, occur "in the course of" that unlawful taking.

---

[7] AS 11.41.510(a)(1).

Based on this reasoning, Gibson asserts that she could not lawfully be convicted of second-degree robbery, even under the State's view of the evidence.

Gibson's interpretation of the robbery statute hinges on her assertion that a "taking" of property is complete at the moment the offender removes the property from the immediate presence and control of the victim — even when, as in this case, the victim perceives the taking and immediately gives chase. But this reading of the robbery statute is at odds with its legislative history.

As this Court explained in *Andrew v. State*, for purposes of assessing accomplice liability under Alaska law, the crimes of theft and robbery continue from the moment the property is taken "until the thief or robber [is] able to place the stolen property somewhere so as not to be found upon him, where it would be securely hidden."[8] In a case decided shortly after statehood, the Alaska Supreme Court applied this doctrine to a theft prosecution in *Mahle v. State*.[9]

The legislative history of our robbery statute supports this construction of the law. Alaska's second-degree robbery statute was patterned after Oregon's third-degree robbery statute, Oregon Revised Statute 164.395.[10] In the commentary to that Oregon statute, the drafters explained that the language "in the course of committing or attempting to commit theft" was intended "to extend from the attempt state through the

---

[8]    *Andrew v. State*, 237 P.3d 1027, 1047 (Alaska App. 2010) (internal quotation marks and alterations omitted) (quoting *United States v. Barlow*, 470 F.2d 1245, 1253 (D.C. Cir. 1972)).

[9]    371 P.2d 21, 25 (Alaska 1962).

[10]    *See* Alaska Criminal Code Revision (Tentative Draft, 1977), Part II, at 110 (Tent. Draft 1977) ("Justification").

phase of flight."[11]  The Oregon courts have recognized this as the proper interpretation of the statute.[12]

This Oregon statute, in turn, was based on the Model Penal Code's formulation of robbery.[13]  According to the drafters of the Model Penal Code, their definition of robbery was drafted for the purpose of:

> extend[ing] robbery to include conduct that occurs in ... flight after the ... commission [of the taking].  Thus, a robbery is committed if the [perpetrator inflicts or threatens immediate serious bodily injury] at any point from the beginning of an attempt to commit a theft through the end of the flight following its attempt or commission.[14]

In sum, both the pre-existing common law of Alaska and the legislative history of our current second-degree robbery statute lead to the conclusion that the phrase "in the course of taking ... property from the immediate presence and control of another" includes the offender's immediate flight after seizing the property.

It is true, as Gibson points out, that the language of the first-degree robbery statute singles out an offender's conduct "in immediate flight thereafter," as if this conduct were not included within the definition of second-degree robbery.  We are not sure why the first-degree robbery statute was drafted in this fashion.  But whatever the drafters may have intended by this phrasing, we are sure that they did not mean to

---

[11]  Proposed Oregon Criminal Code, Final Draft and Report §§ 148-50 cmt. C, at 155 (1970).

[12]  *State v. Jackson*, 596 P.2d 600, 602 (Or. App. 1979) (noting that "the flight stage of a completed theft is regarded as [being] within the course of an attempted theft").

[13]  *See* Proposed Oregon Criminal Code, §§ 148-50 cmt. C, at 155-56; *see also Model Penal Code* § 222.1.

[14]  American Law Institute, *Model Penal Code and Commentaries* (Official Draft and Revised Comments, 1980), Part II, § 222.1, at 99 (internal quotation marks omitted).

narrow the pre-existing definition of robbery so as to exclude any conduct committed during the offender's immediate flight. If anything, the legislative history of our robbery statutes reflects an intent to *expand* the definition of robbery.

We therefore hold that the phrase used in AS 11.41.510(a), "in the course of taking or attempting to take property from the immediate presence and control of another," includes an offender's immediate flight after the seizure or attempted seizure of the property.

Thus, under the facts of this case, Gibson committed robbery when she used force against the coffee shop owner and her daughter to prevent or overcome their resistance to her accomplice's retention of the stolen donation jar.

(Indeed, because the State proved that Gibson's use of force involved the use of a dangerous instrument (the vehicle), it appears that Gibson's conduct constituted the offense of *first-degree* robbery under AS 11.41.500(a)(2).[15] However, Gibson was only charged with second-degree robbery.)

Gibson raises one additional claim: that there was insufficient evidence for the jury to find that she acted with the prohibited purpose — preventing or overcoming resistence to the retention of the property by her accomplice — when she used force against the owner and her daughter. Gibson argues that her only purpose in using force against the owner and her daughter was to facilitate the escape, and that she had no intention of helping her accomplice retain the stolen donation jar.

This was a question of fact for the jury. The jurors were instructed that, to convict Gibson of second-degree robbery, they had to find that she "intended to prevent or overcome resistance to the taking of the property or the retention of the property."

---

[15] Under AS 11.41.500(a)(2), an act of second-degree robbery is raised to first-degree robbery if the offender "uses or attempts to use a dangerous instrument."

The evidence presented at Gibson's trial was sufficient for reasonable jurors to conclude that the State had proved this allegation beyond a reasonable doubt.

*Conclusion*

The judgment of the superior court is AFFIRMED.

Judge MANNHEIMER, concurring.

I write separately because I believe that even under the narrower, common-law definition of robbery, Gibson committed robbery when she used force to prevent the victims from regaining their property during her accomplice's immediate flight from the scene.

According to Professor Perkins's text on the criminal law — Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3rd edition 1982) — the common-law courts distinguished between (1) situations where a person committed a theft and then *later* used force or intimidation to prevent the property owner from retaking the stolen property, and (2) situations where a person committed a theft and used force or intimidation to stop the property owner from *immediately* retaking the property:

The former situation — instances where, "subsequent to the larceny[,] the owner should come upon the thief and be prevented from retaking his property by force or [intimidation]" — was treated by the common law as "larceny and assault, but not robbery." *Id.* at 349. But the latter situation — instances where "one snatches property from the hand of another and uses force or intimidation to prevent an immediate retaking by the other" — was "all one transaction and constitute[d] robbery." *Ibid.*

I acknowledge that the Commentary to the Model Penal Code suggests that the common-law rule was different.

According to the drafters of the Model Penal Code, their definition of robbery (§ 222.1) was intended to expand the common-law definition of robbery by expressly including the use of force (or threat of force) during the thief's immediate flight after the taking. The drafters declared that "[p]rior law was ... narrower ... on this

-11- 2448

point and did not include [the use of] force during flight within the offense of robbery." [1]

In support of this assertion, the Model Penal Code drafters cited a passage from William Blackstone's *Commentaries on the Laws of England* — but the drafters appear to have misinterpreted this passage.

In the cited passage — *Commentaries*, Vol. IV, Chapter 17 ("Of Offenses Against Private Property"), p. 242 — Blackstone addressed the common-law rule that a thief's later use of force to hold onto the property was not deemed a robbery. But note that, in this passage, Blackstone speaks of the act of "privately stealing":

> Lastly, [to constitute robbery,] the taking must be by force, or a previous putting in fear; which makes the violation of the person more atrocious than privately stealing. For if one privately steals sixpence from the person of another, and afterwards keeps it by putting him in fear, this is no robbery, for the fear is subsequent.

Modern readers might easily skip over, or ignore, the word "privately" — because we no longer use this word in the technical sense that Blackstone meant it.

In the eighteenth century, the word "private" meant "secret" or "concealed". [2] A "private stealing" meant an act of larceny that occurred without the property owner's knowledge.

---

[1] American Law Institute, *Model Penal Code and Commentaries* (Official Draft and Revised Comments, 1980), Part II, Definition of Specific Crimes (§§ 220.1 – 230.5), p. 104.

[2] See the *Oxford English Dictionary*, citing these examples of usage from the 1700s:
"He lay private, till his Peace was made with the King." (1700)
"If the sound comes to you dead, and flat, it is a sign of some private infirmity." (1726)
"Let private weddings be for doubtful happiness." (1753)

Thus, the phrase "private stealing" was used to describe the act of a pickpocket if the theft went wholly undetected at the time. Indeed, the prosecutor was required to prove the victim's complete lack of contemporaneous knowledge that a theft was occurring, else the crime was not pickpocketing:

> Up until 1808 [*i.e.*, forty years after Blackstone published his *Commentaries*], this crime [of pickpocketing] involved "privately" stealing from the person of another, which meant without their knowledge, goods worth more than a shilling. The difficulty of proving that the victim had no knowledge of the crime made it difficult to convict defendants of this offence, though many were found guilty [of] lesser charges through use of partial verdicts.

Clive Emsley, Tim Hitchcock, and Robert Shoemaker, "Crime and Justice – Crimes Tried at the Old Bailey", Old Bailey Proceedings Online (www.oldbaileyonline.org, version 7.0, 12 October 2014): "Crime, Justice and Punishment" / "Crimes Tried at the Old Bailey" / "Theft" / "Pickpocketing".

This same crime of pickpocketing — and the phrase, "private stealing" — also applied to thefts committed by prostitutes whose clients were asleep or otherwise distracted. *Ibid*.

Thus, when Blackstone refers to cases where someone "privately steals sixpence from the person of another", he is referring to thefts that go undetected at the time. As Blackstone explains, if the thief "afterwards keeps [the sixpence] by putting [the owner] in fear, this is no robbery, for the fear is subsequent." That is, if the thief's use of force or intimidation occurs afterwards, as part of a separate transaction, then the thief has committed larceny and a separate assault, but not robbery.

The drafters of the Model Penal Code interpreted the passage from Blackstone too broadly when they declared that, at common law, there was no robbery

if the use of force occurred at any time after the moment of the taking. The passage from Blackstone does not support this assertion.

Instead, what Blackstone said on this subject is wholly consistent with the rule stated in *Perkins & Boyce*: there was no robbery at common law if the thief used force at a *separate time* to retain the property; but the crime of robbery did include the use of force during the *same transaction* as the act of taking.

Returning to Gibson's case: The intention of the drafters of the Model Penal Code and the drafters of the Alaska criminal code was to expand the common-law definition of robbery. The common-law definition of robbery already encompassed the conduct exhibited in Gibson's case. This Court would therefore be thwarting the intention of the legislature if we construed our second-degree robbery statute to exclude Gibson's conduct from the definition of robbery.

For these reasons (in addition to the reasons explained in the lead opinion), I join my colleagues in affirming Gibson's conviction for second-degree robbery.